# Supreme Court of Florida

_____

No. SC14-814
_____

**DONALD OTIS WILLIAMS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[January 19, 2017]

PER CURIAM.

Donald Otis Williams, who was fifty years old at the time of the crime, was convicted of the 2010 kidnapping, robbery, and first-degree murder of eighty-one-year-old Janet Patrick. A jury recommended that Williams be sentenced to death for the murder by a vote of nine to three, and the trial court, after concluding that the aggravating factors outweighed the mitigating circumstances, imposed the death penalty. Williams appeals his convictions and death sentence. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

For the reasons set forth below, we affirm Williams' convictions but reverse the death sentence based on the United States Supreme Court's opinion in Hurst v.

Florida (Hurst v. Florida), 136 S. Ct. 616 (2016), and this Court's opinion on remand in Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016). Although a special verdict form was used in Williams' penalty phase, the jury did not unanimously conclude that there were sufficient aggravating factors to impose death or that the aggravation outweighed the mitigation—critical findings that must be made by a unanimous jury under the Sixth Amendment of the United States Constitution and article I, section 22, of the Florida Constitution. See Hurst, 202 So. 3d at 43-44. Further, the jury's recommendation for death by a vote of nine to three in this case does not satisfy the constitutional requirement explained in Hurst that the jury's final sentencing recommendation be unanimous. Id. Thus, we conclude that the Hurst error in Williams' sentencing was not harmless beyond a reasonable doubt. See id. at 66-69. Accordingly, we reverse Williams' sentence of death and remand for a new penalty phase.

## FACTS AND PROCEDURAL HISTORY

### The Guilt Phase

The victim, Janet Patrick, was last seen alive on October 18, 2010, after shopping for groceries at Publix near her home in Lake County, Florida. The defendant, Donald Otis Williams, through both security video and eyewitness testimony, was identified as accompanying her at Publix and getting into the passenger seat of her vehicle, a white Chevrolet Impala. Multiple witnesses

testified that they later saw Williams in a white Chevrolet similar to the one owned by the victim. One of the witnesses, an acquaintance of Williams, testified that Williams borrowed his shovel in the days following the victim's disappearance, and never returned it. On October 23, a law enforcement officer found Williams in Polk County, Florida sitting in the victim's car with her credit cards in his pocket.

While in police custody, Williams gave interviews to the media, in which he admitted to being with the victim at Publix but denied harming her. He told the press that he and the victim were abducted by an unidentified assailant. Williams claimed that during the abduction, both he and the victim were in the trunk and prayed together, and the victim told Williams that she was afraid something "too personal" for Williams to discuss with the press was going to happen to her. According to Williams, the assailant beat the victim and eventually stopped the car somewhere in Polk County, where he ordered Williams to put the victim on the ground. Williams claimed that he was then able to escape in the victim's car.

Law enforcement officers investigated Williams' story about an assailant but were unable to corroborate it. Witnesses who interacted with Williams in the days following the victim's disappearance testified that there was no indication that he had been abducted. Williams eventually repudiated the story. The day after Williams' press interviews, law enforcement found the victim's nude, partially

skeletonized remains in Polk County beneath two tires in a wooded area a mile and a half from Williams' former residence, where he lived from 1991 to 1996.

Crime scene investigators documented and processed the scene where the body was found. They found the victim's grocery shopping list next to her remains. There were drag marks that lined up to where the body was found. Officials did not find any jewelry on or near the body or inside the car, nor did they find the victim's wallet or purse. The body itself was unclothed, with the exception of a pair of socks and a medical alert necklace, and severely decomposed.

The medical examiner, Dr. Barbara Wolf, performed the autopsy and reviewed the victim's medical records, photos from the crime scene, Lake County Sheriff's Office reports, laboratory reports, and interviews that Williams gave to the media. Because of the condition of the victim's body when it was found, Dr. Wolf testified that the cause of death could not be determined, but ruled out accidental death and opined that the manner of death was homicide. Carlton Jane Beck Findley, an expert in forensic entomology, determined that the victim most likely died between sunrise on October 19, 2010, and sunset on October 20, 2010. Katie Skorpinski, an expert in forensic anthropology, examined the remains at the C.A. Pound Human Identification Lab at the University of Florida and found that

the body had no fractures from around the time of death, no signs of thermal damage, and no other perimortem damage.

Crime scene investigators processed the victim's automobile. Testifying at trial, they explained the various items that were recovered from the vehicle. In the trunk, they found two separate pieces of trunk carpeting, the spare tire cover from beneath the trunk carpeting, a spare tire locking device, and a piece of plastic irrigation tubing. In the passenger compartment, they found another piece of plastic irrigation tubing on the front passenger floorboard, a towel on the dashboard, one pair of green and white shorts on the backseat, two pairs of underwear briefs—one inside of the other—on the backseat, one pair of jeans on the floor in front of the driver's seat, a walking cane, and various other items.

Later, in a nearby cemetery, where some of Williams' family members were buried, law enforcement found the shovel that Williams had borrowed from his acquaintance in the days after the victim's disappearance. Tubing similar to that which was found in the victim's vehicle was found near the shovel. An expert in the field of trace evidence analysis testified that the tubing found at the cemetery appeared to have been stretched and had characteristics consistent with being connected to the piece of tubing that had been in the trunk.

Dr. Mohammad Amer, an expert in DNA profiling, then testified regarding the scientific significance of these items. He testified that objects recovered from

inside the trunk of the victim's vehicle contained blood stains that matched the victim. Specifically, on the carpeting of the trunk, Dr. Amer testified about a stain that "gave chemical indications for the presence of blood," which had a mixed DNA profile, with the major DNA profile of this stain matching the victim's profile. The other profile was indeterminate. The major DNA profile matching the victim had a frequency of occurrence for unrelated individuals of one in 620 quadrillion Caucasians, one in 45 quintillion African-Americans, and one in 170 quadrillion Southeastern Hispanics.

Dr. Amer testified that the spare tire cover also had a stain giving "chemical indications for the presence of blood" that had a partial DNA profile that matched the victim with statistical chances of the partial profile occurring in the population of one in 12 Caucasians, one in 31 African-Americans, and one in 10 Southeastern Hispanics. The spare tire locking device had four stains that gave "chemical indications for the presence of blood," three of which resulted in partial profiles matching the victim. In two of the stains, the statistical chances of finding the partial profile were one in 470 Caucasians, one in 1.7 billion African-Americans, and one in 290 million Southeastern Hispanics. In the third stain, the statistical chances of the profile being found in the population were one in 1 billion Caucasians, one in 4.1 billion African-Americans, and one in 500 million Southeastern Hispanics. There were also two stains inside the trunk lid, which

both "gave chemical indications for the presence of blood" that matched the victim's DNA profile. In one of those stains, the frequency of occurrence of that DNA profile was one in 2 quadrillion. In the other stain, the frequency of occurrence was one in 310 quadrillion.

Dr. Amer also testified about various items found inside the interior of the victim's vehicle. He tested some of the items and found DNA that matched Williams' DNA profile. These items included the towel that was found on the dashboard, which contained Williams' complete DNA profile. The chances of this DNA profile occurring in the population were one in 2.5 quintillion Caucasians, one in 3.5 quintillion African-Americans, and one in 19 quintillion Southeastern Hispanics. Dr. Amer also tested the pair of green and white shorts found in the backseat, which contained a hair. The shorts contained cells with a partial profile matching Williams, with the chances of appearing in the population of one in 18 quadrillion, and the hair contained a partial profile matching Williams, with the chance of finding it in the population of one in 290,000.

Dr. Amer also testified regarding other items found in the interior of the vehicle that contained the DNA of both Williams and the victim. Specifically, these items were the pair of jeans that was found on the floor in front of the driver's seat and the two pairs of underwear briefs, which had been found lying, one inside of the other, on the backseat. Dr. Amer swabbed the "friction points" of

the jeans—inside of the crotch area, inside the pockets, and the waistband area—and found DNA with a mixed profile matching Williams and the victim. The major contributor to the mixed profile matched Williams, with chances of being found in the population of one in 2.5 quintillion Caucasians, one in 3.5 quintillion African-Americans, and one in 19 quintillion Southeastern Hispanics. The minor contributor matched the victim with chances of being found in the population of one in 160,000 Caucasians, one in 290,000 African-Americans, and one in 160,000 Southeastern Hispanics.

Dr. Amer also testified about hairs that were on both of the pairs of briefs that had been found. One of these hairs matched Williams, and two hairs matched the victim. Inside one of these pairs of briefs, Dr. Amer found a semen stain in the front crotch area, and the DNA profile of the semen stain matched Williams with chances of this profile being found in the population of one in 3.9 quintillion. Dr. Amer noted that it is not uncommon to find semen in the crotch area of a male's underwear. Inside the pair of briefs containing the semen stain, Dr. Amer also found a mixture of epithelial cells (skin cells). The victim and Williams were included as possible contributors to the mixture of skin cells with chances of being found in the population of one in forty.

Inside the crotch area of the other pair of briefs, Dr. Amer found a mixture of skin cells matching the victim and Williams with statistical chances of their

DNA profile being found in the population of one in 2.8 million. On cross-examination, conducted by the defendant, who represented himself for most of the guilt phase, Dr. Amer acknowledged that it could be possible for DNA to transfer if someone touched someone with their hands and then put their hands somewhere else, or if two items of clothing from two different people were commingled. Although the DNA mixture of the defendant and victim was located on the inside of the briefs, Dr. Amer also acknowledged that it is not uncommon to obtain a mixed profile on an outer garment, and this would be possible on an article that was touching a car seat that had been used for a long time.

Dr. Amer was recalled via telephone the day after he testified in person and was asked by the prosecutor whether he could determine if the skin cells resulted from vaginal secretions. He testified that he could not determine whether the skin cells came from that source.

Sally Streeter, Williams' probation officer,[1] testified that Williams did not have a place to live as of October 8, 2010. Williams' brother wired Williams fifty dollars on Saturday, October 16, and told him that he would not be sending any more money. Williams later told a detective that on October 18, the day he was

---

1. The jury was not told that Sally Streeter was Williams' probation officer during the guilt phase. The jury was informed that Williams was on probation only during the penalty phase.

with the victim at Publix, he was wearing multiple layers of clothing, including two pairs of underwear and shorts under a pair of jeans. This description was consistent with the articles of clothing found inside the vehicle by crime scene investigators and tested for DNA by Dr. Amer.

In his defense case-in-chief, Williams called witnesses to support his position that he was suffering from a mental illness or seizures at the time of the crime. These witnesses included family members, who testified about Williams' behavior and experiences since they had known him, and two people who saw him and the victim in Publix on the day of the victim's disappearance. He also called psychiatrist Dr. Alan S. Berns, who testified that he had diagnosed Williams with bipolar affective disorder with associated psychotic features and post-traumatic stress disorder (PTSD). Dr. Berns testified that, after meeting with Williams in 2012 and reviewing some of Williams' medical records, he determined Williams had a history of alcohol abuse, cannabis use, and possible use of ephedra. On cross-examination, Dr. Berns testified that, in his professional opinion, Williams was not legally insane at the time of the offense.

Williams called forensic psychologist Dr. Steven N. Gold, who also testified—based on his review of Williams' records, a meeting with Williams in 2013, and speaking with Williams' family members—that Williams had bipolar disorder and PTSD. Finally, Williams called neurologist Dr. Jean Cibula, who

specializes in epilepsy and had conducted a week-long epilepsy assessment of Williams in 2012. Dr. Cibula testified that she was unable to document objective evidence of a seizure disorder.

After calling these witnesses, Williams requested that the trial court reappoint the former defense counsel who represented him for approximately two years prior to his decision to represent himself in the beginning of 2013. When defense counsel resumed representation, they recalled two witnesses who had testified during the State's case-in-chief, as well as Corporal Tamara Dale, who reviewed the security footage from the residential development where the victim lived but was unable to verify whether the victim's vehicle entered or exited.

The State presented several witnesses in rebuttal, including individuals who interacted with Williams close to the time of the crime, who testified that he did not appear to be suffering from mental illness or hallucinations. The State also offered its own experts, including Dr. Ava Land, a clinical psychologist, and Dr. Rafael Perez, a psychiatrist, who both disputed the diagnosis of bipolar disorder. Instead, both experts diagnosed the defendant with antisocial personality disorder and alcohol abuse, and Dr. Perez additionally thought Williams might be malingering.

The jury found Williams guilty of one count of robbery, one count of kidnapping, and one count of first-degree felony murder.

## The Penalty Phase

During the penalty phase, the State called the victim of Williams' previous carjacking arrest to establish the prior violent felony aggravating factor. The carjacking victim testified that Williams forced himself into her vehicle and sexually assaulted her. She further testified that she had agreed to Williams pleading to carjacking as opposed to sexual battery and kidnapping to avoid testifying in court at that time. The State presented victim impact evidence through testimony of the victim's friends and acquaintances and photographs and a poem that the victim carried with her.

Williams called his brothers, Randy and David Williams, who both testified about Williams' childhood and their abusive father. Additionally, Williams' son, Ron Jon Williams, and Williams' longtime girlfriend, Shirley Kay Harvey, testified in mitigation. Williams also presented mental mitigation. He called Dr. Gold again, who opined that Williams suffered from, among other things, PTSD, severe substance abuse, and bipolar disorder. Dr. Gold also stated that Williams would qualify for the statutory mitigating circumstances that he was under the influence of an extreme mental or emotional disturbance at the time of the crime and that his capacity to appreciate the criminality of his conduct was substantially impaired.

Similar to Dr. Gold, Dr. Berns testified again during the penalty phase, stating that Williams had bipolar disorder as well as brain abnormalities from a history of head injuries. As a result, Dr. Berns opined that Williams might have problems with impulse control and qualifies for the statutory mitigating circumstance that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

Williams called Dr. Eric L. Mings, a neuropsychologist who reviewed Williams' records and performed neuropsychological testing on Williams in 2012. Dr. Mings testified that Williams' MRI and PET scans were consistent with bipolar disorder, and the neuropsychological test results reflected a deterioration in brain functioning that could be the result of seizures or alcohol abuse. He also concluded that Williams suffered from mild neurocognitive disorder as a result of a traumatic brain injury in an area of the brain associated with emotions that control behavior. He concluded that, consistent with the statutory mitigating circumstance, Williams' capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

At the conclusion of the penalty phase, the jury recommended that Williams be sentenced to death by a vote of nine to three after completing a special verdict form, which showed that the jury unanimously found the following aggravating factors: Williams was on felony probation at the time of the murder; Williams was

previously convicted of a felony involving the use of violence; the murder was committed while Williams was involved in a kidnapping; and, the victim was particularly vulnerable due to advanced age or disability. However, after being told by the trial court that the jury only needed to fill out the mitigation verdict form if it found the listed mitigating circumstances by a majority of the jury, the jury left that form completely blank.

The trial court held a <u>Spencer</u>[2] hearing during which the State called Dr. Land, who testified that after watching videos from a Dollar General Store depicting Williams approaching another elderly woman and reviewing the statements of the employees at Publix, there was no indication of a reaction consistent with a flashback. Dr. Land, who had interviewed Williams, testified that, during her interviews with him, Williams never told her that he had been sexually abused by his father but, instead, stated that he had been sexually abused by three people, one of whom was his stepmother, who assaulted him inside a white car.

In its sentencing order, the trial court found and gave great weight to each of the following four statutory aggravating factors: (1) Williams was on felony probation at the time of the murder; (2) Williams was previously convicted of a

---

2. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

felony involving the use or threat of violence; (3) the murder was committed while Williams was involved in a kidnapping; and (4) the murder victim was particularly vulnerable due to advanced age or disability. These were the same aggravating factors that the jury found unanimously as indicated by its special verdict form. In addition, the trial court found that the State had proven the aggravating factor that the murder was committed for pecuniary gain and afforded it some weight. The jury found this aggravating factor by a vote of nine to three.

The trial court found one statutory mitigating circumstance—that Williams' capacity to conform his conduct to the requirements of the law was substantially impaired. As to this mitigating circumstance, the trial court explained in detail the conflicting experts' testimony and concluded:

> This Court is faced with experts looking at the same facts and coming to very different conclusions. This Court finds, however, that even with the differing diagnoses proffered by the experts, it would be reasonable to conclude that under any of the diagnoses, the Defendant would fulfill the criteria for this mitigator. Dr. Land's definition of antisocial personality disorder being a person who does not conform to what is expected in society. It involves a lot of rule-breaking, deceitfulness and a lack of moral judgment. It is also characterized by a lack of empathy or an inability to feel compassion for the victims of an individual's actions. This Court finds that pursuant to either set of diagnoses, the Defendant has proven this mitigator by the greater weight of the evidence.

However, the trial court rejected the statutory mitigating circumstance that the crime was committed while Williams was under the influence of extreme mental and emotional disturbance, explaining:

As an initial matter, this Court must address the issue of the Defendant's veracity. The record is replete with instances of the Defendant fabricating stories to serve his purpose. A primary example is his fabrication that Ms. Patrick and he were kidnaped by a black man behind the Publix store. There are numerous other examples . . . . Thus, this Court finds it cannot rely on evidence to support a mitigator if it is solely based on the Defendant's truthfulness. This Court finds there must be some independent evidence other than the words of the Defendant to support the finding of a mitigator.

Respectfully, as stated above, this Court finds this mitigator has not been proven by the greater weight of the evidence. This Court had five very well qualified experts who could not agree on a diagnosis of the Defendant. This Court finds it significant [that] the defense experts did not view the videos showing the interaction of the Defendant and Ms. Patrick on the day Ms. Patrick disappeared. Dr. Gold concluded the Defendant killed Ms. Patrick while under the influence of extreme mental or emotional disturbance. Moreover, Dr. Gold admitted the Defendant never told him what he was thinking or feeling at the time the crime was committed. It is not apparent that any of the experts asked the Defendant about his actions at the time of the crime. Thus, it is mere speculation as to what occurred at the time of the abduction and death of Ms. Patrick. Moreover, the basis for Dr. Gold's, Dr. Bern's and Dr. Ming's diagnoses was, in large part, the Defendant relating of his symptoms. As noted above, this Court finds this to be very problematic and unreliable. This Court finds this mitigator was not proven by the greater weight of the evidence and accords it no weight.

(Footnote omitted.)

The trial court also found thirteen nonstatutory mitigating circumstances and afforded each the following weight: (1) Williams manifested appropriate courtroom behavior (slight weight); (2) he served in the Marines (slight weight); (3) he abused drugs and alcohol from an early age (some weight); (4) he would be a model prisoner (some weight); (5) he suffered physical, mental, and emotional

- 16 -

abuse as a child (some weight); (6) he was involved in a serious collision which resulted in a broken leg (little weight); (7) his father and grandfather were abusive alcoholics (some weight); (8) his father abused his mother in his presence (some weight); (9) he suffered head injuries while growing up (some weight); (10) he was a good father (slight weight); (11) he was a good companion to the mother of his child (slight weight); (12) he was a hard worker (slight weight); and (13) he helped others (some weight).[3] After this evaluation of the aggravating factors and mitigating circumstances, the trial court sentenced Williams to death, concluding that the aggravating factors far outweighed the mitigating circumstances.

## ANALYSIS

On direct appeal to this Court, Williams alleges that the trial court erred in (1) failing to give counsel adequate time to properly prepare the case after reappointment; (2) allowing the medical examiner to testify as to matters beyond her medical expertise; (3) allowing the jury to hear that Williams had a criminal past during the guilt phase; (4) permitting prosecutorial misconduct during voir dire and closing arguments; (5) allowing the State to introduce evidence of Williams' prior violent felony and argue for an unsupported aggravating factor in

---

3. The trial court also found that Williams did not prove that he had been sexually abused as a child and afforded this proposed mitigating circumstance no weight because all of the evidence presented in support of it was based on Williams' "questionable veracity."

the penalty phase; (6) allowing the introduction of improper victim impact evidence; and (7) denying jury instructions and a verdict form enumerating each nonstatutory mitigating circumstance. Williams also alleges that (8) the aggravating factors fail to narrow the field of persons eligible for the death penalty, and (9) he is entitled to relief based on Ring v. Arizona, 536 U.S. 584 (2002). Through supplemental briefing, Williams argues that he is entitled to relief on the Ring claim based on the United States Supreme Court's recent decision in Hurst v. Florida.

Because we determine that Williams is entitled to a new penalty phase proceeding under Hurst, we address only Williams' guilt phase claims and none of the other penalty phase claims. In addition, we address whether the evidence in this case was sufficient to sustain Williams' first-degree felony murder conviction, which this Court is independently obligated to review in death penalty cases.

### I. Denial of a Continuance

Williams' first claim is that the trial court erred by not providing an "adequate" continuance during the guilt phase once the Public Defender's Office was reappointed to the case during the middle of the guilt phase. Williams asserts that this caused prejudice, specifically in the guilt phase, because defense counsel was not adequately prepared for the DNA evidence the State presented at trial that Williams asserts was based on a supplemental report dated April 1, 2013, which

was issued after the DNA expert's 2011 report and 2012 deposition, and, more importantly, after counsel was discharged.

On the morning of Wednesday, August 21, 2013—after six days of trial and two and a half days into Williams' defense presentation—Williams moved to re-appoint counsel. After being reappointed, defense counsel moved for a mistrial, or, in the alternative, a continuance, so that it could adequately prepare to represent Williams. Defense counsel requested an expedited transcript of testimony that had already occurred, stating that preparation could take weeks and that it had not worked out a mitigation case by the time it was relieved of duties in February 2013. The trial court denied the motion for mistrial and continued the trial until Monday, August 26. The trial court reasoned that "the Public Defender's Office was representing [Williams] for over two years and we were at the eve of trial when Mr. Williams decided to represent himself, so that had the advantage of getting this case prepared for trial." Defense counsel was provided with audio recordings of the first six days of trial.

At a status hearing on Friday, August 23, defense counsel renewed the motion for mistrial and moved alternatively for a further continuance for the remainder of the guilt phase. Counsel explained that he was "trying to struggle through listening to the tape that the court reporter ha[d] furnished [counsel]." The trial court denied the motions and indicated it had not yet made a decision on

whether to grant a continuance between the guilt and penalty phases. When the parties reconvened for the rest of the guilt phase on Monday, August 26, defense counsel renewed the motions for mistrial and a further continuance. Counsel said that he could not hear the testimony on recall of Dr. Amer, the DNA expert, but did not specify how much time was needed. The trial court again denied the motions.

We have stated that "[a] court's ruling on a motion for continuance will only be reversed when an abuse of discretion is shown." Smith v. State, 170 So. 3d 745, 758 (Fla. 2015) (quoting Snelgrove v. State, 107 So. 3d 242, 250 (Fla. 2012)). As explained in Smith:

> This standard is generally not met "unless the court's ruling on the continuance results in undue prejudice to the defendant." [Snelgrove, 107 So. 3d at 250]. . . . "While death penalty cases command our closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance." Doorbal [v. State], 983 So. 2d [464,] 486 [(Fla. 2008)] (quoting Hernandez–Alberto v. State, 889 So. 2d 721, 730 (Fla. 2004)).

Id. at 758-59.

This Court has held that a trial court does not abuse its discretion in denying a continuance "where the requesting party has unjustifiably caused the delay or requests an indefinite suspension of the proceedings." Snelgrove, 107 So. 3d at 251. In Wyatt v. State, 641 So. 2d 1336, 1340 (Fla. 1994), the defendant told his counsel that he did not want to call any witnesses in mitigation, and the night before the penalty phase, knowing of their unavailability, instructed counsel that he

- 20 -

wanted his mother and sister to testify on his behalf. This Court determined there was no abuse of discretion in the trial court refusing to suspend the penalty phase proceedings indefinitely. Id.

In this case, the trial court granted at least one continuance requested by defense counsel before Williams began self-representation. When Williams sought to represent himself, defense counsel had been representing Williams for about two years, and the trial was set to begin less than a month later. After defense counsel was reappointed, the trial court gave defense counsel a short continuance from the day Williams sought reappointment of counsel, which was a Wednesday, to the following Monday. While defense counsel moved for a longer continuance on the basis that it could not hear some of the trial testimony on the audio recordings, defense counsel did not specify a definite time frame that it needed for an additional continuance.

This case is factually distinguishable from Wike v. State, 596 So. 2d 1020, 1025 (Fla. 1992), the case upon which Williams relies, in which this Court determined that the trial court abused its discretion by denying a continuance where the request was for "a short period of time and for a specific purpose." In this case, defense counsel was given a short continuance but then requested additional continuances, not for "a short period of time," but for an unspecified amount of time.

Williams specifically asserts that as a result of being denied a longer continuance, defense counsel could not listen to the testimony of Dr. Amer, the DNA expert, and was unable to review the April 2013 DNA report, and therefore did not know to object to part of the State's rebuttal closing argument in the guilt phase based upon that testimony. Williams claims that defense counsel would have objected to the State's suggestion that a sexual battery had taken place because a mixture of the victim's and Williams' DNA was found inside both pairs of underwear briefs that had been on the backseat, by arguing that the evidence did not support the implication.

However, Williams has failed to demonstrate prejudice. Defense counsel did not inform the trial court that they could not hear the lengthy <u>live</u> testimony of the DNA expert, which involved a discussion of all the DNA findings, including the mixture of Williams' and the victim's DNA on the pairs of underwear briefs, but rather stated that they could not hear the DNA expert's testimony when he was <u>recalled</u> by the State, which was done telephonically. During this telephonic testimony on recall, the DNA expert stated only that he could not determine whether skin cells were from vaginal secretions, and it therefore neither added to nor detracted from his in-person testimony. Even without being granted an additional continuance to allow defense counsel to listen to the telephonic testimony or read the April 2013 report, defense counsel could have objected to the

State's inference that Williams had sexually battered the victim because they knew that the State did not charge Williams with a sexual offense.

We conclude that defense counsel's inability to hear Dr. Amer's telephonic testimony, which did not add to or detract from his live trial testimony, was neither a basis for a further continuance without a specific request to obtain an audible recording or transcript of this brief testimony, nor the basis for a mistrial. There was no undue prejudice to Williams, and any difficulty caused by Williams requesting reappointment of counsel was a result of a conscious choice by Williams to discharge counsel, proceed pro se, and then change his mind again near the end of the guilt phase.

Both the State and Williams were entitled to orderly and timely proceedings. After the trial court granted a short continuance, it did not abuse its discretion in denying the motion for an additional continuance for an unspecified length of time. Because the trial court did not abuse its discretion in denying a longer continuance and acted appropriately in providing time for defense counsel to review the testimony that had already been heard, we conclude that Williams is not entitled to relief with respect to this claim.

## II. Medical Examiner's Testimony During the Guilt Phase

In his second claim, Williams contends that the trial court erred by allowing the medical examiner, Dr. Wolf—who testified while Williams was still pro se—to

opine that the manner of death was homicide based on evidence outside her area of expertise, and that such an opinion invades the province of the jury on the ultimate question for the jury's determination. We disagree.

Without objection, Dr. Wolf, who performed the autopsy and was qualified in the field of forensic pathology, testified that she was unable to determine the cause of death because the remains were only bones with some skin attached. Because of the body's condition, Dr. Wolf was unable to observe any apparent injuries that could have accounted for the victim's death. Dr. Wolf explained that "[i]n a case such as this, where the cause of death isn't obvious, we take into account every available information."

Accordingly, Dr. Wolf, in trying to determine the cause and manner of death, reviewed the victim's medical records to familiarize herself with the victim's medical history and condition, and concluded that the victim was not suffering from any life-threatening diseases. She also reviewed photos from the crime scene, Lake County Sheriff's Office reports, laboratory reports, and interviews that Williams gave to the media. She consulted with professionals at the C.A. Pound Human Identification Lab for anthropological assistance due to the body's skeletonized state.

She explained that the "manner of death" refers to whether the death was an accident, suicide, homicide, natural, or otherwise undetermined. Dr. Wolf

determined that the manner of death in this case was, with a reasonable degree of medical certainty, a homicide. She stated, "There was nothing specific that I could say, that's what caused this death," so "the cause of death was certified as homicidal violence of unknown means, meaning that by my review of the circumstances and the scene of death, I was confident that the death was a homicide, but I could not determine specifically how she was killed."

Because of the state of the victim's body, Dr. Wolf could rule out certain possibilities such as being struck in the face or being manually strangled, but could not rule out other causes of death, such as strangulation by ligature, shooting, or stabbing. She concluded that the physical facts did not support the story that Williams gave to the press that the victim was beaten in the passenger's seat or was alive inside the trunk. Dr. Wolf also ruled out accidental death.

Because Williams failed to object to Dr. Wolf's testimony, he must show fundamental error in order to be entitled to relief. See Doty v. State, 170 So. 3d 731, 743 (Fla. 2015). An error is fundamental if it "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Anderson v. State, 841 So. 2d 390, 403 (Fla. 2003). This is a "high burden, which requires an error that goes to the foundation of the case or the merits of the cause of action and is equivalent to a

- 25 -

denial of due process." Bailey v. State, 998 So. 2d 545, 554 (Fla. 2008)(quoting sources omitted).

## A. Whether the Medical Examiner Testified Outside Her Area of Expertise

This Court has previously recognized that medical examiners, whether they personally performed the autopsy or not, may testify as to their opinions based upon objective evidence. In Geralds v. State, 674 So. 2d 96, 100 (Fla. 1996), this Court determined that the trial court did not abuse its discretion by allowing the medical examiner to provide an opinion based upon review of slides taken at the murder scene and during the autopsy, the medical examiner's written records, and previous testimony. Similarly, in Capehart v. State, 583 So. 2d 1009, 1013 (Fla. 1991), this Court determined that a proper predicate for the medical examiner's opinion as to the cause of death had been established where her opinion was "based upon the autopsy report, the toxicology report, the evidence receipts, the photographs of the body, and all other paperwork filed in the case."

However, an expert cannot simply rely on baseless assertions or conjecture. See Hawkins v. State, 933 So. 2d 1186, 1188-89 (Fla. 4th DCA 2006) (the medical examiner's opinion that the victim died as a result of an injection of silicone into subcutaneous tissue that travelled into the bloodstream was inadmissible because the medical examiner admittedly did not know whether this conclusion was true, conceded she was not an expert regarding the mechanism or speed that silicone

migrates through the body, did not review any literature regarding the effects of silicone in the body, and could not point to anything to support her conclusion); Fisher v. State, 361 So. 2d 203, 204 (Fla. 1st DCA 1978) (it was error to allow the medical examiner to opine that the victim's knife wounds were more characteristic of those made by a woman than a man because this opinion was "simply based on vague notions of stereotyped characteristics of the men and the women in our culture and it bore no relationship to [the defendant] other than she was a woman"); Wright v. State, 348 So. 2d 26, 30-31 (Fla. 1st DCA 1977) (the medical examiner's testimony went beyond his competence when opining that the victim had severe injuries that were inflicted prior to being buried by the defendant's bulldozer, based in part upon how moist earth would act as an anchor to the body, how far apart the treads of the bulldozer were, and how bulldozers work).

The record in this case does not support Williams' assertion that Dr. Wolf's testimony was based on speculation and conjecture or was "unsupported by any discernible, factually-based chain of underlying reasoning." See Mt. Sinai Med. Ctr. of Greater Miami, Inc. v. Gonzalez, 98 So. 3d 1198, 1202 (Fla. 3d DCA 2012) (quoting Div. of Admin. v. Samter, 393 So. 2d 1142, 1145 (Fla. 3d DCA 1981)). Dr. Wolf stated that when the cause of death is not obvious, as a medical examiner, she takes into account all the available information. To form her opinion, she consulted with an anthropological expert and relied upon the police reports, the

autopsy, the victim's medical records, and photos of the scene. Accordingly, Dr. Wolf did not testify outside her field of expertise.

## B. Whether the Medical Examiner's Opinion Testimony Invaded the Province of the Jury

Williams also claims that Dr. Wolf's opinion testimony invaded the province of the jury. However, this claim is without merit because Dr. Wolf's opinion, which was based on her training and experience, assisted the jury in understanding the evidence, and she did not testify to conclusions that the jury was qualified to make or to the ultimate question for the jury's determination—whether Williams was guilty of the crimes for which he was charged.

We have determined that a trial court has not abused its discretion when permitting an expert to testify if the expert's testimony, based on his or her training and expertise outside of the common understanding of the jury, assisted the jury in understanding the evidence or determining a fact in issue. See McWatters v. State, 36 So. 3d 613, 630-31 (Fla. 2010) (concluding that an expert's opinion, based on his training and experience, that a rape occurred helped the jury assess "what" happened); Smith v. State, 28 So. 3d 838, 856 (Fla. 2009) (denying the defendant's claim that the medical examiner's opinion invaded the province of the jury because it assisted jurors in deciding what happened, not who was responsible for the acts perpetrated against the victim). Likewise, in this case, Dr. Wolf provided an

opinion based on her training and experience as a medical examiner, which assisted the jury in understanding the evidence.

Moreover, Dr. Wolf did not opine as to the ultimate question to be determined by the jury. Dr. Wolf did not implicate Williams as being guilty of first-degree murder. Medical examiners have been permitted to opine in many cases that the manner of death was a "homicide," though in those cases, this Court did not address whether that opinion invaded the province of the jury. See, e.g., Larkin v. State, 147 So. 3d 452, 457 (Fla. 2014) (involving a medical examiner who opined that the manner of death of the victim was a homicide); Brown v. State, 143 So. 3d 392, 397 (Fla. 2014) (same); Kalisz v. State, 124 So. 3d 185, 191 (Fla. 2013) (same).

Williams argues that Ruth v. State, 610 So. 2d 9 (Fla. 2d DCA 1992), and Gurganus v. State, 451 So. 2d 817 (Fla. 1984), support his position, but those cases are distinguishable. In Ruth, the defendant was charged with "maintaining an airplane used for keeping or selling drugs." 610 So. 2d at 10. The use of the defendant's aircraft was a necessary element of the crime with which the defendant was charged. Id. The expert witness, a customs agent, testified, "I believe the aircraft was used and was set up to smuggle narcotics." Id. at 11. The Second District held this was inadmissible as this was the "sole evidence" that went to the ultimate act for which the defendant was charged. Id. Here, Dr. Wolf's expert

testimony is not the "sole evidence" of the crimes of which Williams has been charged.

In Gurganus, 451 So. 2d at 821, the trial court had excluded the defense expert's testimony as to whether the defendant's actions were those of a "depraved mind" or a "premeditated plan," legal terms with specific legal definitions. This Court determined that the trial court did not err in excluding this testimony because it was a "legal conclusion no better suited to expert opinion than to lay opinion, and as such, was an issue to be determined solely within the province of the jury." Id.

For all these reasons, Dr. Wolf's testimony as to the manner of death was not error, let alone fundamental error. Accordingly, we deny relief as to this claim.

### III. Guilt Phase Testimony Revealing Williams' Criminal Past

In his third claim, Williams argues that the trial court abused its discretion in denying three motions for mistrial made by his newly reappointed counsel when State witnesses referenced Williams' criminal history in the State's rebuttal case. Prior to these three instances, when Williams was acting pro se, Williams and his witnesses referred to his criminal history. First, Williams stated in his opening statement that he had been to trial once before on a misdemeanor, but that he was acquitted. Next, during Williams' direct examination of his brother Randy, Randy stated, "2010, are you speaking about when you were released from prison?"

Additionally, defense expert, Dr. Berns, testified during Williams' direct examination that Williams had told him that he "had been arrested a few times for DUI, and once, I believe for a disorderly intoxication."

After defense counsel resumed representation, defense counsel moved for a mistrial three times due to comments made in the State's rebuttal case. Each motion was denied. In the first instance, the State's rebuttal witness Howard Lawrence, head of the mental health department at the Lake County Detention Center, explained the specific medications prescribed to Williams to rebut the suggestion that they were prescribed to treat a psychiatric condition or a seizure disorder, and explained that these medications were prescribed to Williams for mood stabilization and to aid sleep. In that context, Lawrence explained in general that sociopathy was "another [way] of depicting antisocial personality disorder in a person that's got a lengthy criminal history who looks like he's probably vying for some medicine because he's . . . irritable and disgruntled and probably not sleeping too well." Defense counsel moved for a mistrial after this comment.

The second motion for mistrial occurred during the rebuttal testimony of Dr. Rafael Perez, a psychiatrist who treated Williams beginning in 2010, who was called to rebut the suggestion that Williams had suffered from seizures or bipolar disorder and to also testify regarding the reasons for Williams' prescribed medications. Dr. Perez referred to records from Williams' previous prison stay,

using the term "department of corrections," but was immediately interrupted by the prosecutor, who stated, "Well, we don't want to go into the location." Then, defense counsel moved for a mistrial.

Finally, the last motion for mistrial was also made during direct examination of Dr. Perez, after the prosecutor used the word "inmate" in reference to those records. After the first two references to Williams' criminal history, the trial court instructed the jury to disregard the comments, but defense counsel declined the suggestion for a curative instruction after the third reference.

A trial court should grant a motion for mistrial only "when an error is so prejudicial as to vitiate the entire trial." Smith, 170 So. 3d at 757 (quoting Jackson v. State, 25 So. 3d 518, 528 (Fla. 2009)). "[T]his Court reviews a trial court's ruling on a motion for mistrial under an abuse of discretion standard." Id. (quoting Jackson, 25 So. 3d at 528).

As we have recently explained, "[r]emarks that relate to a defendant's prior imprisonment are to be evaluated in the context of the surrounding circumstances and do not always require reversal." Fletcher v. State, 168 So. 3d 186, 207 (Fla. 2015). Here, during Williams' self-representation, he and his witnesses informed the jury that Williams had been in prison, had been arrested a few times, and had been to trial on a misdemeanor offense. By the time the improper statements were made, the jury was already aware that Williams had at least some criminal history

and had been in prison.  See Evans v. State, 800 So. 2d 182, 189 (Fla. 2001) (where a State witness referred to the defendant's prior criminal record, any possible error resulting from this remark was harmless because the defendant admitted on the stand that he had two felony convictions).

In this case, as a result of the defendant's own remarks and those of his witnesses, the jury was aware of some criminal history.  The statements that occurred during the State's rebuttal of Williams' defense that his mental illness precipitated the murder were brief; the trial court gave curative instructions after the first two times and the fleeting comments were not the focus of the witnesses' testimony.  Accordingly, the trial court did not abuse its discretion in denying a motion for mistrial.

## IV.  Prosecutor's Comments During Voir Dire and Guilt Phase Closing Arguments

In his fourth claim, Williams alleges that the State engaged in prosecutorial misconduct during voir dire and guilt phase closing arguments.  Because no objections were raised to any of these allegedly improper comments, Williams is entitled to relief only if fundamental error occurred as a result of these comments.  Mordenti v. State, 630 So. 2d 1080, 1084 (Fla. 1994).  "[F]or an error to be so fundamental that it can be raised for the first time on appeal, the error must be basic to the judicial decision under review and equivalent to a denial of due

process." State v. Johnson, 616 So. 2d 1, 3 (citing D'Oleo-Valdez v. State, 531 So. 2d 1347 (Fla. 1988); Ray v. State, 403 So. 2d 956 (Fla. 1981)).

## A. Voir Dire

Williams identifies two instances of alleged impropriety made by the prosecutor during voir dire, which occurred when Williams was acting pro se. Neither comment was objected to. First, Williams alleges that the State improperly suggested more evidence of the crime not presented in the guilt phase would be adduced during the penalty phase through the following comments:

> And after you all have returned verdicts on all three counts, then and only then, if the Defendant is found guilty of murder in the first degree, <u>we will present additional evidence and give additional arguments and additional law to help you to make this life and death decision that we were talking about</u>.

(Emphasis added.)

Later, the prosecutor made the statement that the State would present additional evidence two more times during voir dire:

> But if and only if the jury unanimously decides he's guilty of first degree murder, additional evidence presented going to the Defendant's background, going to his character, possibly going to additional factors in the crime itself are allowed per the statute, things that you may not be allowed to hear in the first phase of the trial become relevant when you're trying to decide what is a fair sentence.

These statements mainly reflect what is stated in section 921.141(1), Florida Statutes (2010), which provides that in the penalty proceeding, "evidence may be presented as to any matter that the court deems relevant to the nature of the crime

and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances." We conclude there was no error, much less fundamental error.

Williams also alleges that it was improper for the prosecutor to comment during voir dire that "would you agree that while you have the Defendant's life in your hands, <u>you also have justice for the victim and the victim's family also in your hands</u>?" (Emphasis added.) Later on, the State engaged a specific juror, and told that juror that in addition to Williams' life being at stake, "justice for [a] little old lady," was also at stake.

Florida courts have condemned comments asking for justice for the victim and this Court has reversed a conviction as a result of that type of improper comment. <u>See</u> <u>Cardona v. State</u>, 185 So. 3d 514, 522 (Fla. 2016); <u>Davis v. State</u>, 136 So. 3d 1169, 1197 (Fla. 2014); <u>Crew v. State</u>, 146 So. 3d 101, 110 (Fla. 5th DCA 2014); <u>Edwards v. State</u>, 428 So. 2d 357, 359 (Fla. 3d DCA 1983). Thus it was improper for the prosecutor to appeal to "justice for [a] little old lady." The comments—to which Williams did not object—however, were early in the trial during voir dire and not repeated. Therefore, we conclude that the prosecutor's error in making these comments did not "reach[] down into the validity of the trial itself" to the extent that a verdict of guilt could not have been obtained without the

assistance of the alleged error.  <u>Doty</u>, 170 So. 3d at 743 (quoting <u>Snelgrove</u>, 107 So. 3d at 257).

## B.  Guilt Phase Closing Argument

Next, Williams takes issue with three aspects of the State's guilt phase closing arguments, which occurred after defense counsel was reappointed.  First, Williams alleges it was improper for the State to suggest that an uncharged sexual battery took place.  Specifically, the prosecutor stated:

> These are the two pair of underwear . . . with their DNA, the numbers were 1 in 2.8 million, inside the crotch of one of the two pair of underwear . . . .  Directly north of that particular spot where that DNA was found is his semen, [defense counsel] suggested, well, it wasn't very much.  Well, I don't know.  I don't recall any testimony about the size of the stain.  It was enough to get a clear reading.  It's his semen above, towards the fly there, DNA.  Her blood inside her trunk . . . .  Under those tires she's wearing a pair of those, kneehighs . . . .  That's all she's wearing.

The prosecutor went on to say:

> Is it a coincidence that she's naked and a mixture of his and her DNA is found on the inside of the crotch of his briefs, just below a semen stain that happens to be his?  Is that just another coincidence?  Probably not.

Finally, the prosecutor stated: "[I]t's clear from the evidence that then, after he's won over her trust, he took advantage of her, I would suggest to you, in more ways than one."  None of these arguments were objected to and no motion for a mistrial was made on the basis of these comments.

- 36 -

Although prosecutors are "permitted wide latitude in closing arguments" and are allowed to make inferences reasonably drawn from the evidence, they "are not permitted to make improper argument." Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007). These comments were improper because there was not enough evidence to lead to the reasonable inference that Williams engaged in sexual misconduct, and the State never charged Williams with having committed a sexual offense against the victim.

The evidence of sexual misconduct was insufficient to allow the prosecutor to insinuate it occurred. Specifically, the DNA expert testified that it was not uncommon to find semen inside the crotch area of a man's underwear. And although both of the briefs that were found on the backseat contained a mixture of the victim's and Williams' skin cells inside the crotch area, the DNA expert indicated that it would be possible for skin cells to transfer if the clothing of two people was commingled.

Further, the State never charged Williams with a sexual offense, and courts condemn arguments suggesting a defendant is guilty of an uncharged crime. See Huff v. State, 437 So. 2d 1087, 1090-91 (Fla. 1983) (reversing a conviction where the prosecutor suggested in closing that the defendant was guilty of an uncharged crime); Jackson v. State, 690 So. 2d 714, 717 (Fla. 4th DCA 1997) (same). Thus, the State's innuendo that a sexual battery took place was improper.

Williams also challenges some of the prosecutor's other comments as being unsupported embellishments appealing to the jurors' emotions. However, we disagree and conclude that the rest of the prosecutor's statements were fair inferences reasonably drawn from the evidence and, therefore, not improper.

We must next determine if any of these comments, whether individually or cumulatively, amounted to fundamental error. See Braddy v. State, 111 So. 3d 810, 838 (Fla. 2012). This Court does not "examine the allegedly improper comments in isolation," but examines the totality of errors in the closing argument and determines whether the cumulative effect of the numerous improprieties deprived Williams of a fair trial. Id. at 843 (quoting Card v. State, 803 So. 2d 613, 622 (Fla. 2001)).

The prosecutor's guilt phase closing argument suggestion that Williams had engaged in sexual misconduct did not amount to fundamental error. The error was accompanied by the fact that admissible evidence in the guilt phase showed that Williams stated that the victim feared that something "too personal" for Williams to tell the press would happen to her, that a mixture of Williams' and the victim's DNA was found in both pairs of black briefs that were found in the backseat of the car, and that the victim's body was found in the nude. That evidence was admitted without objection and would have allowed the jurors to potentially reach the

conclusion for themselves that Williams had sexually battered the victim. In this context, the comments did not rise to the level of fundamental error.

We have determined that these comments do not individually constitute fundamental error. We now consider whether the cumulative effect of the improper comments denied Williams his right to a fair guilt phase trial. See id. Considering the prosecutor's remarks, in addition to not individually amounting to fundamental error, we conclude that these improprieties do not cumulatively constitute fundamental error, which would entitle Williams to a new guilt phase proceeding. There were a small number of improper remarks made during the course of the entire guilt phase. Further, there was a substantial amount of evidence to convict Williams on all three of the charges for which he was indicted—kidnapping, robbery, and first-degree felony murder—such that the cumulative effect of these improper comments was not so prejudicial that it vitiated the entire trial. See Chandler v. State, 702 So. 2d 186, 191 n.5 (Fla. 1997).

## V. Sufficiency of the Evidence

The Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Davis v. State, 148 So. 3d 1261, 1270 (Fla. 2014); see also Fla. R. App. P. 9.142(a)(5). "In reviewing the sufficiency of the evidence, the question is whether, 'after viewing the evidence in the light most favorable to the State, a

- 39 -

rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.' " Davis, 148 So. 3d at 1270 (quoting Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006)).

The evidence in a capital case is judged to be sufficient when it is both competent and substantial. See Davis v. State, 121 So. 3d 462, 494 (Fla. 2013). This Court "views the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found beyond a reasonable doubt the existence of the elements of the crime." Fletcher, 168 So. 3d at 221 (citing Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).

In this case, Williams was the last person to be seen with the victim on Monday, October 18, 2010, at Publix. At the time, Williams was homeless and living on money wired to him by his family. One of his brothers, however, had just informed him that he would no longer send Williams money.

Multiple witnesses testified that, in the days following the victim's disappearance, they saw Williams driving in a white Chevrolet like the one owned by the victim. One witness saw that Williams had a pouch full of credit cards and enough cash to buy beer and fast food, and another witness saw Williams buy several beers with cash. During this time, Williams also borrowed, without returning, a shovel from his acquaintance.

On Saturday, October 23, the victim's white Chevrolet Impala was found in the parking lot of a closed-down restaurant in Polk County, with the license plate obscured by leaves and branches. Williams was found sitting in the car with the victim's credit cards in his pocket. Various items were collected from the vehicle, including irrigation-type tubing on the floor in front of the front passenger seat and in the trunk, two pairs of underwear briefs, jeans, and a cane. The victim had been using a cane the day of her disappearance.

The DNA evidence suggested that Williams was in close contact with the victim. There was DNA inside the "friction points" of the pair of jeans that was found on the floor in front of the driver's seat matching both Williams and the victim. The two pairs of briefs found on the backseat had hairs on them matching Williams and the victim. There were skin cells matching Williams and the victim inside of both pairs of briefs. The DNA evidence also showed that the victim's blood was in the trunk. Specifically, bloodstains found on the trunk carpeting, spare tire cover, and spare tire locking device matched the victim's DNA.

On October 25, Williams gave the press an interview, during which he stated that he was with the victim at Publix, but claimed an unknown assailant abducted them and killed the victim and that Williams was able to escape in the victim's vehicle. However, the physical evidence did not support this story, and Williams eventually admitted that he had fabricated the story.

The victim's body was ultimately discovered underneath two tires in an area a mile and a half from Williams' former residence. The body, which was mostly unclothed aside from socks and a medical alert necklace, was badly decomposed and was devoid of a purse or jewelry. In a nearby cemetery where Williams' family members were buried, law enforcement found the shovel that Williams borrowed. Tubing, which appeared to have been stretched, was found near the shovel and was consistent with the tubing that was found in the victim's vehicle.

The medical examiner opined that the manner of death was a homicide, though she was unable to ascertain the precise cause of death. Although Williams placed his mental health at issue and suggested that he did not recall what happened due to a seizure, hallucination, or blackout, the State presented a significant amount of evidence to cast doubt on that claim.

Therefore, competent, substantial evidence existed to support Williams' convictions.

## VI.  Hurst v. Florida and Hurst

Williams next argues that the trial court erred in sentencing him to death under Florida's former death penalty statute, which violates the Sixth Amendment under the principles announced in Ring v. Arizona, 536 U.S. 584 (2002). After briefing and oral argument had taken place in this case, the United States Supreme Court decided Hurst v. Florida. In Hurst v. Florida, the United States Supreme

Court determined that "[t]he analysis the <u>Ring</u> Court applied to Arizona's sentencing scheme applies equally to Florida's." 136 S. Ct. at 621-22. Therefore, Florida's capital sentencing scheme was unconstitutional because "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." <u>Id.</u> at 619. On remand from the United States Supreme Court, in <u>Hurst</u>, we concluded:

> [W]e hold that the Supreme Court's decision in <u>Hurst v. Florida</u> requires that all the critical findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury. We reach this holding based on the mandate of <u>Hurst v. Florida</u> and on Florida's constitutional right to jury trial, considered in conjunction with our precedent concerning the requirement of jury unanimity as to the elements of a criminal offense. In capital cases in Florida, these specific findings required to be made by the jury include the existence of each aggravating factor that has been proven beyond a reasonable doubt, the finding that the aggravating factors are sufficient, and the finding that the aggravating factors outweigh the mitigating circumstances. We also hold, based on Florida's requirement for unanimity in jury verdicts, and under the Eighth Amendment to the United States Constitution, that in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous.

<u>Hurst</u>, 202 So. 3d at 44. The decisions in <u>Hurst v. Florida</u> and <u>Hurst</u> apply to this case, which we review on direct appeal. <u>See</u> <u>State v. Johnson</u>, 122 So. 3d 856, 861 (Fla. 2013) (citing <u>Griffith v. Kentucky</u>, 479 U.S. 314, 328 (1986); <u>Smith v. State</u>, 598 So. 2d 1063, 1066 (Fla. 1992)).

Following <u>Hurst v. Florida</u>, we ordered that Williams and the State file supplemental briefs to address its impact on this case. Further, Williams requested

and we granted leave to file supplemental briefing based on our holding in Hurst. Through supplemental briefing, Williams argues that his death sentence was imposed in violation of Hurst v. Florida and Hurst, and, as a result, his death sentence must be commuted to a life sentence pursuant to section 775.082(2), Florida Statutes (2010). Alternatively, he argues that he must get a life sentence because Hurst error is structural error and, therefore, not amenable to harmless error review. The State argues that no error occurred at all in this case, but if it has, it is harmless.

In Hurst, we rejected the argument that section 775.082(2) requires commutation to a life sentence of a death sentence that was imposed in violation of Hurst v. Florida. Hurst, 202 So. 3d at 66. We also determined that Hurst errors are capable of harmless error review. Id. at 67. Thus, we must determine whether a Hurst error occurred in Williams' penalty phase and, if so, whether the error was harmless beyond a reasonable doubt.

First, we determine that a Hurst error occurred in Williams' penalty phase. In this case, the special verdict form used for the penalty phase showed that the jury unanimously found that four out of the five aggravating factors presented by the State were proven beyond a reasonable doubt. This only satisfies the first finding the jury must make to impose death in Florida, as explained further in Hurst. See id. at 53-54. The jury did not indicate any findings as to the sufficiency

of the aggravating factors, nor did the jury indicate whether it determined that the aggravating factors outweighed the mitigation presented. See id.

While special verdict forms, like the one used in Williams' penalty phase, provide courts with more information about the jury's decision-making process than usual, the information provided by the verdict form in this case did not meet the constitutional requirements of Hurst. Nor did the jury unanimously recommend a sentence of death, as is required by article I, section 22, of the Florida Constitution under Hurst. Id. at 44. Accordingly, there was a Hurst error in this case. We, therefore, consider whether the error in Williams' penalty phase was harmless beyond a reasonable doubt.

As we explained in Hurst:

> The harmless error test, as set forth in Chapman and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986). Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence. See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000). Although the harmless error test applies to both constitutional errors and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," DiGuilio, 491 So. 2d at 1137, and the State bears an extremely heavy burden in cases involving constitutional error. Therefore, in the context of a Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable

doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:

> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

> DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

Hurst, 202 So. 3d at 68.

For the following reasons, we conclude that the State in this case has not proven beyond a reasonable doubt that the error was harmless. Although four out of five aggravating factors were found unanimously, due to the jury's nine to three recommendation for death, we cannot conclude beyond a reasonable doubt that the jury also unanimously found that there were sufficient aggravating factors to impose death, or that the aggravators outweighed the mitigation. See § 921.141, Fla. Stat. (2015), invalidated by Hurst v. Florida, 136 S. Ct. 616; Hurst v. Florida, 136 S. Ct. at 621; Hurst, 202 So. 3d at 68.

It is clear that three jurors voted for Williams to receive a life sentence. We cannot speculate why these three jurors did not find that sufficient aggravating factors existed to impose death or that those aggravating factors outweighed the mitigation, or whether the three jurors, in fact, made those findings but were

- 46 -

following the trial court's instructions that they were not required to recommend death. See Hurst, 202 So. 3d at 58 (quoting Fla. Std. Jury Instr. (Crim.) 7.11 Penalty Proceedings—Capital Cases).

In this case, there was a significant amount of mitigation presented during the penalty phase. Williams called his brothers, who testified about their abusive father, and several doctors, who testified about Williams' post-traumatic stress disorder, substance abuse, and other mental mitigation. Williams attempted to establish the statutory mitigating circumstances of being under the influence of extreme mental or emotional disturbance and diminished capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law, as well as nonstatutory mitigation.

The fact that the jury left the mitigation form blank does not affect our analysis. Based on the record, the jury apparently left the form blank because it was following the instructions on the special verdict form, and the trial court's instructions for the jurors to leave the form blank unless a majority of the jury found the listed mitigating circumstances to exist. In other words, the fact that the jury left the form blank does not indicate that no jurors found any of the mitigation.

Furthermore, even if not a single juror found that any mitigation was established, there is still no way to ascertain whether the jury unanimously concluded that sufficient aggravation existed to warrant a death sentence. Based

- 47 -

on the jury vote of nine to three, we cannot conclude that the <u>Hurst</u> error in this case was harmless beyond a reasonable doubt. For these reasons, we grant Williams relief based on <u>Hurst</u>. Accordingly, we reverse the sentence of death and remand for a new penalty phase.

## CONCLUSION

After a thorough review of all the issues raised by Williams, as well as a review of whether sufficient evidence supports Williams' convictions, we affirm Williams' convictions for first-degree murder, kidnapping, and robbery, but we reverse his sentence of death and remand for a new sentencing proceeding pursuant to <u>Hurst</u>.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY and POLSTON, JJ., concur as to the conviction and dissent as to the sentence.
PERRY, Senior Justice, concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PERRY, Senior Justice, concurring in part and dissenting in part.

I concur with the majority's decision to affirm Williams' convictions and its determination that the Sixth Amendment requires that we vacate Williams' death sentence. However, because Florida law requires that Williams be sentenced to life in prison as a consequence of his unconstitutional death sentence, I disagree

with the majority's decision to remand for a new penalty phase proceeding instead of remanding for imposition of a life sentence. See § 775.082(2), Fla. Stat. (2016).

As I explained fully in Hurst v. State, 202 So. 3d 40, 75-76 (Fla. 2016) (Perry, J., concurring in part and dissenting in part), there is no compelling reason for this Court not to apply the plain language of section 775.082(2), Florida Statutes. Because the majority of this Court has determined that Williams' death sentence was unconstitutionally imposed, Williams is entitled to the clear and unambiguous statutory remedy that the Legislature has specified:

> In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment as provided in subsection (1).

See § 775.082(2), Fla. Stat. (emphasis added). The plain language of the statute does not rely on a specific amendment to the United States Constitution, nor does it refer to a specific decision by this Court or the United States Supreme Court. Further, it does not contemplate that all forms of the death penalty in all cases must be found unconstitutional. Instead, the statute uses singular articles to describe the circumstances by which the statute is to be triggered. Indeed, the statute repeatedly references a singular defendant being brought before a court for sentencing to life imprisonment. I consequently cannot agree that the statute was intended as a fail-

safe mechanism for when this Court or the United States Supreme Court declared that the death penalty was categorically unconstitutional.  Cf. Hurst, 202 So. 3d at 64.

An Appeal from the Circuit Court in and for Lake County,
    Mark Anthony Nacke, Judge - Case No. 352011CF000105XXXXXX

James S. Purdy, Public Defender, and Nancy Jean Ryan, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and C. Suzanne Bechard, Assistant Attorney General, Tampa, Florida,

    for Appellee