# Third District Court of Appeal

## State of Florida

Opinion filed August 16, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-2289
Lower Tribunal No. 09-29998
_____


**Johnathan Simon,**
Appellant,

vs.

**The State of Florida,**
Appellee.


An Appeal from the Circuit Court for Miami-Dade County, Dennis J. Murphy, Judge.

Carlos J. Martinez, Public Defender, and Robert Kalter, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Jonathan Tanoos, Assistant Attorney General, for appellee.


Before SALTER, LOGUE and LUCK, JJ.

LUCK, J.

Johnathan Simon shot and killed Jason Maharaj, and shot and attempted to kill fourteen year old Harris Ostral, as the two victims were walking to the Burger King near school. The jury, after an eight day trial, convicted Simon of first degree murder and attempted first degree murder. Simon contends that his convictions and life sentences should be reversed because it was fundamental error for the state's deoxyribonucleic acid expert to bolster her credibility by testifying about how her work was reviewed by a colleague. We find no fundamental error, and affirm.

*Factual Background and Procedural History*

On September 10, 2009, victims Maharaj and Ostral, along with several of their friends, were walking to a nearby Burger King restaurant after school let out. Simon, following the group, pulled out a gun and started to fire several shots, two of which struck Ostral. Ostral ran into the Burger King while the rest of his friends tried to run away. Ostral, still inside the Burger King, heard three or four more shots. When he went outside, Ostral saw Maharaj lying on the floor dying.

Detective Jonathan Ortiz found Simon four blocks away at an Advanced Auto Parts. Simon looked "shocked and sweaty." Det. Ortiz asked where he was coming from, and Simon responded he was coming from his girlfriend's house and pointed north. Det. Ortiz thought Simon's response was unusual because he was walking from the south. Because Simon matched the description of the shooter,

and the unusual way he was acting, Det. Ortiz detained Simon.  Ostral, the victim, and Angela Gothier-Rodriguez, who was sitting in a car at the Burger King drive-thru window during the shooting, identified Simon as the gunman.

The next day, another detective canvassed the area between the Burger King and the Advanced Auto Parts for the murder weapon.  In a grassy area three-hundred feet from the Burger King, the canvassing detective found the murder weapon wrapped in a white shirt.  The casings and projectiles (parts of the ammunition) collected at the Burger King matched the firearm found in the grassy area.

The shirt, firearm, and the firearm's magazine were tested for Simon's DNA.  At trial, the state's DNA expert gave a detailed description of the general steps her lab takes in conducting DNA tests:

> State:  When you receive samples for analysis, how many steps do you put them through during the course of your testing?
>
> DNA expert:  Well, it definitely doesn't happen like it does on CSI over a commercial break.  There are several steps to the DNA analysis process starting with the first step, which is called the extraction.  In this step we're trying to remove the DNA from the actual item that it's on, and this could be a swab that we receive, this could be an item of clothing.  The next step would be the quantitation step, and at this step we want to see how much DNA we have, because we want to be within a certain range to give us the best chance of getting a DNA profile when we got to our next step, which is the amplification process.  Now copies of the DNA and labeling the DNA with fluorescent tags so that when we put our sample through an instrument and use software programs, we're able to detect a DNA profile.

State:  Now as you proceed through these steps, how do you ensure quality accuracy and make sure there's no cross contamination.

DNA expert:  So there's a number of things we do.  The first step is actually wearing gloves, lab coats, face mask.  And we also include one sample or several, the requirements, additional samples that don't have any DNA.  So they're included so we can check that our chemicals don't have a DNA profile in them.  At certain steps of the DNA process, we also need to include a positive and negative control to make sure that the chemicals are working properly.  In addition to that, we have certain requirements as far as labeling our tubes, handling our tubes.  We'll only have one tube that contains DNA open at any one time to make sure that the integrity of that sample is maintained.

State:  Do you always get a DNA profile from items that are submitted to the lab for testing?

DNA expert:  No, we don't always get a DNA profile.
. . . .
State:  After you're finished testing, do you have your results looked at by someone else for review?

DNA expert:  Yes, that's correct.  Before the report can be released, the case had to go through the technical review process.  So what this entails is another DNA analyst, sometimes it's a supervisor, but if not, there's other people that can do it as well.  I've reviewed my coworkers' cases as well.  But we have to go through the case[,] examine the worksheets, look at the data, and make sure that we would come up with the same DNA profiles and the same conclusions.

There was no objection during this part of the DNA expert's testimony.

The direct examination then turned to what the DNA expert tested in this case, and the results of her testing.  No comparable DNA was found on the shirt and firearm, but the state's DNA expert was able to get a DNA profile from the

4

firearm's magazine. The DNA profile on the magazine was a mixture, and there was a one-in-fifty chance that Simon's DNA was a possible contributor to the mixture.

The jury convicted Simon of first degree and attempted first degree murder, and the trial court sentenced him to two concurrent life sentences. This appeal based on the DNA expert's testimony followed.

*Standard of Review*

"The admission or exclusion of evidence," generally, "is subject to an abuse of discretion standard of review." Kopsho v. State, 84 So. 3d 204, 217 (Fla. 2012). Where a defendant failed to object to expert testimony, however,

> he must show fundamental error in order to be entitled to relief. An error is fundamental if it reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error. This is a high burden, which requires an error that goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process.

Williams v. State, 209 So. 3d 543, 557-58 (Fla. 2017) (citations and quotations omitted).

*Discussion*

Simon contends that the DNA expert's last answer in the block quote above was fundamental error because it bolstered her testimony by referring to another

5

analyst reviewing her work. We assume without deciding that the DNA expert's answer was improper bolstering. Even so, the error was not fundamental.

Florida courts have found bolstering errors like the one alleged here and still upheld serious criminal convictions. In Schwartz v. State, 695 So. 2d 452 (Fla. 4th DCA 1997), for example, the fourth district affirmed the defendant's child murder conviction even after finding an expert bolstering error because "the error was harmless under the facts in this case." Id. at 455.[1] In Bunche v. State. 5 So. 3d 38 (Fla. 4th DCA 2009), the same court affirmed the defendant's burglary conviction even after finding an expert bolstering error because the defense theory was that the state could not prove when the defendant had been in the burgled property. Id. at 41.[2] And in Tolbert v. State, 114 So. 3d 291 (Fla. 4th DCA 2013), the fourth district, again, affirmed the defendant's rape and kidnapping convictions even after finding a bolstering error because the non-testifying expert's opinion was only that there was male DNA on the rape kit swab, and did not specifically implicate the defendant. Tolbert, 114 So. 3d at 295.[3]

---

[1] In Schwartz, the state's expert forensic pathologist testified regarding the cause of death "that when he gets involved in an unusual case he does not rely solely on his own opinions, but regularly consults other pathologists." Schwartz, 695 So. 2d at 454. The Schwartz expert said he "consulted two pathologists on his staff, and three others from Pennsylvania, South Carolina and Miami, Florida." Id.

[2] In Bunche, the state's fingerprint expert testified that "[e]very time we have an identification where we've established the identifying an individual in a crime, we always have two people look at it." Bunche, 5 So. 3d at 39-40.

[3] In Tolbert, the state's DNA expert testified about a DNA test conducted by a different expert years earlier that confirmed there was male DNA on the swab

6

If these bolstering errors were fundamental, as Simon claims, the fourth district could not have applied the harmless error standard and affirmed the convictions in Schwartz, Bunche, and Tolbert. "By its very nature, fundamental error has to be considered harmful. If the error was not harmful, it would not meet our requirement for being fundamental." Reed v. State, 837 So. 2d 366, 370 (Fla. 2002).

We reach the same conclusion here. The DNA results, as in Tolbert, did not identify Simon as possessing the firearm and shirt. The results showed that a mixture of DNA was found on the magazine of the firearm, and there was a one-in-fifty possibility Simon's DNA contributed to the mixture. This was hardly conclusive. Simon's DNA was not on the two places it would most likely have been found – the shirt he was wearing and the firearm he was holding. In its closing argument, the state acknowledged the DNA expert "can't always give you a complete answer," and "can't tell you, yes, it's a match or it's not a match." "Nobody's ever said that the DNA evidence is going to convict [Simon]," the state conceded. Like in Tolbert, even with the bolstering, the expert still did not implicate Simon such that the verdict of guilty could not have been obtained without the bolstered DNA evidence.

---

taken from the victim following her kidnapping and rape. Tolbert, 114 So. 3d at 293-94.

Moreover, even without the DNA, the evidence of Simon's identity as the shooter was strong, and came from multiple eyewitnesses. Ostral, the attempted murder victim, identified Simon as the one who shot at him and his friends. Gothier-Rodriguez, who was sitting in a car at the drive-thru window, identified Simon as the shooter. Simon also matched the shooter's description given by multiple on-scene witnesses. And, moments after the murder, Simon was found four blocks away from the Burger King, nervous and with an implausible story. Unlike the one-in-fifty DNA test, this was sound evidence on which the jury could have found Simon guilty of murder and attempted murder.

*Conclusion*

Because the DNA expert's testimony was not fundamental error, we affirm Simon's convictions and sentences.

Affirmed.