820 So.2d 906 (2002)
Michael GRIFFIN, Appellant,
v.
STATE of Florida, Appellee.
No. SC93906.
Supreme Court of Florida.
May 30, 2002.
*909 James Marion Moorman, Public Defender, and Kevin Briggs, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal the judgments and sentences of the trial court imposing the death penalty upon Michael Griffin. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm Griffin's convictions and sentences of death.

FACTS
Griffin pled guilty to two counts of first-degree murder. At the penalty phase, Griffin waived an advisory jury and the evidence was presented to the judge. He also waived the presentence investigation report and the Spencer[1] hearing. After hearing testimony and considering evidence and sentencing memoranda from both sides, the trial court sentenced Griffin to death for each of the murders.
The following facts were developed during the sentencing hearing before the trial court. Sometime in 1989, after graduation from high school, Griffin started working for his father as a service and repair technician at Moore's Refrigeration (Moore's). Moore's dealt with companies which needed servicing for their vending machines and coolers. One such vending company was Service America Corporation (Service America). At various times, Griffin had been to Service America to fix or service their refrigerators and coolers. Consequently, Griffin had become very familiar with Service America's warehouse. Particularly, he had become aware that Service America kept a great deal of cash on site. That cash was deposited daily in lockers at Service America by drivers who had returned from replenishing and collecting the coins from the vending machines throughout various sites.
In 1995, Griffin stopped working for Moore's. He had become addicted to cocaine and started living his life mainly to procure the money to acquire the drug. At some point, Griffin moved out of his house and moved in with a drug dealer acquaintance, Nicolas Kocolis. Anthony Lopez, another addict, also resided at Kocolis's place along with Kocolis's girlfriend. From there, Griffin was able to sell drugs for Kocolis and would use the proceeds to support his addiction.
Sometime during his stay at Kocolis's, Griffin felt he needed more money. Griffin was in arrears with his child support, automobile, and pager payments. As a result, he decided to steal the money from *910 Service America's lockers. He brought up the idea to Kocolis and Lopez while at Kocolis's place. He told them that he knew where the cash was at Service America and would be able to steal it. The three of them then started planning the theft. Although Kocolis was initially supposed to take part in the crime, he later decided against it. Instead, Griffin and Lopez agreed to go to Service America.
Prior to going to Service America, Griffin traded his gold chain to Kocolis for a 9mm pistol to use during the theft. He also had a shotgun, though the testimony is not clear as to who used which weapon during the commission of the crime. Finally on October 6, 1995, Griffin and Lopez set out to carry out their plan. At Shorty's, a bar located across from Service America, they sat and observed Service America for a while. Because of the locked gate and the alarm system, Griffin realized that he would not be able to get in. Having serviced the equipment at Service America many times, he then hoped that an employee would be present and would recognize him from past jobs and thus let him in. On that night, no employee showed up and the plan was thwarted.
The following night, on October 7, they went back to the bar, once again hoping that an employee would be at Service America. Tom McCallops (McCallops), an employee who had seen Griffin fix coolers many nights in the past, arrived with his wife, Patricia McCallops. As predicted by Griffin, when Griffin and Lopez went to Service America, McCallops immediately recognized Griffin and let them in. Once inside, they wielded their weapons. Lopez then took the McCallopses to a cooler and locked them inside while Griffin opened the money lockers with a crowbar. Griffin testified that while he was opening the money lockers, he heard a shotgun and ran back and saw Lopez shooting at McCallops as he attempted to rise off the floor. He then grabbed the shotgun from Lopez.
However, other witnesses testified that Griffin admitted otherwise after the murder. Immediately after the murder, Griffin had a celebration party at the Kimberly Hotel where he and the guests had champagne and cocaine. There, Griffin told Melissa Clark, Kocolis's girlfriend, that he and Lopez killed the McCallopses. Griffin told her that once the money bags were placed in his van, he went back inside, stood the McCallopses together and shot them with the shotgun. Afterwards, he told Lopez to clean up and finish the job (with the 9mm). Mary Hall, Griffin's girlfriend at the time, gave similar testimony. They also testified that Griffin's arms were all scratched up and his clothes bloody when they met him at the party.[2]
The medical examiner testified with regard to the result of the autopsies and her observations. She stated that McCallops had five gunshot wounds, one from a shotgun and four from a handgun. The shotgun wound, which appeared to be the first shot McCallops received, was life-threatening in that it severed the aorta. Mrs. McCallops had two gunshot wounds (9mm), one in the head and one in the chest. Pictures were introduced at the penalty phase to show that the metallic grill of the money lockers was pried open and contained spots of blood. The spots of blood were found to be consistent with Griffin's.
The detectives testified as to the findings of their investigation. The findings *911 establish that sometime after the celebration at the hotel, the money was taken to Kocolis's place. Since the loot ($11,300) was made up mostly of coins, Kocolis, Lopez, Griffin, and some others proceeded to pack some of it in paper rollers. Afterwards, they took the rolled coins to Seminole Bingo and exchanged them for currency bills (about $300). They then burned the empty coin bags. The investigators recovered some of the partially burnt bags. They were also able to match tire tracks left at the warehouse with the tires on Griffin's van.
After the above evidence was presented, testimony was offered with regard to Griffin's mental state. Griffin was found to be competent by the two doctors, Dr. Michael Maher, a psychiatrist and expert on forensic psychology, and Dr. Sidney Merin, a clinical psychologist. Some of the testimony, however, dealt with an accidental pellet gunshot injury Griffin suffered at the age of ten. After undergoing surgery, Griffin suffered a speech impairment for an unspecified number of months. Dr. Maher testified that while the injury did not cause any permanent damage, it left Griffin vulnerable to other impairments that might occur in the future. For instance, Griffin's depression, attempted suicide at the age of sixteen as a result of complications with a girlfriend, and later cocaine use related in some way to the head injury. On the other hand, Dr. Merin testified categorically that the injury simply had no effect on Griffin's brain. He stated that due to the location of the injury, any defect would only have resulted in cognitive disability. Given Griffin's performance in high school (3.3 GPA) and his certification and work in refrigeration which required high-order brain-processing skills, his cognitive ability was definitely not damaged. Therefore, Dr. Merin concluded, there was no permanent damage.
Although Griffin denied killing the McCallopses, he pled guilty to the charges and accepted the factual basis of the plea. He stated that had he not taken Lopez to Service America, this would not have happened; therefore, he felt responsible for what happened. Sometime before or at the time he was put in jail, Lopez developed severe mental problems. Consequently, he has since been institutionalized in order to restore his competency to stand trial. As to Kocolis, he was incarcerated on a violation of probation.

SENTENCE
As earlier mentioned, Griffin pled guilty to the two counts of first-degree murder. At the penalty phase, Griffin waived an advisory jury, any presentence investigation report, and a Spencer hearing. After hearing evidence and considering memoranda from both sides, the trial court sentenced Griffin to death on both counts.
As support for the death sentences, the trial court found four aggravating factors: (1) the defendant was previously convicted of another capital offense or of a felony involving the use of violence;[3] (2) the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or attempt to commit, or in flight after committing or attempting to commit a kidnapping;[4] (3) the capital felony was committed for the purpose of avoiding or preventing a lawful *912 arrest;[5] and (4) the capital felony was committed for pecuniary gain.[6] As it relates to statutory mitigators, the court found that Griffin had no significant prior criminal history. The court also found that Griffin partly established the mitigator that he was an accomplice in the capital felony committed by another person and his participation was relatively minor. Griffin's age (25 at the time of the murders) was rejected as a statutory mitigator.[7] Griffin raises three issues for review.[8]

1. Waiver of Penalty Phase Jury

We first consider Griffin's challenge of the voluntariness of the waiver of his right to a jury during the penalty phase. After Griffin pled guilty to the charges, he indicated that he wanted to waive his right to a sentencing jury. The trial judge subsequently conducted a colloquy to ensure that Griffin understood the nature and importance of the rights he intended to relinquish. Griffin now argues that the trial court, during the colloquy, erroneously advised him of the purpose and function of the penalty phase and that of the penalty phase jury. Specifically, he contends that the judge stated that the purpose of the penalty phase was to give the State an opportunity to establish the aggravating circumstances without stating that Griffin would have an equal opportunity to present evidence of mitigation.
As a preliminary matter, we note that the standard by which we determine the voluntariness of a waiver is similar to that of determining the validity of a plea. See, e.g., Lamadline v. State, 303 So.2d 17, 20 (Fla.1974) (citing Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), in analysis of waiver of sentencing jury issue). Consequently, we look to the procedures and body of law dealing with pleas and challenges associated therewith in determining the validity of a waiver.
However, since Griffin in no way raised this issue in the trial court, we must first decide whether we can even address this claim for the first time on direct appeal. As a general matter, the circumstances of a guilty plea entered into at trial may be heard on direct appeal upon one of two grounds. The first ground relates to matters which occurred prior to entering the plea, such as a trial court's ruling on a pretrial motion, and a defendant is required to expressly reserve the right to appeal in order to be heard on this ground. See Robinson v. State, 373 So.2d 898, 901 (Fla.1979); Gonzalez v. State, 685 So.2d 975, 976 (Fla. 3d DCA 1997).
The second ground relates to matters which occurred contemporaneous with entering the plea, such as questions with respect to the voluntary character of the plea. See Robinson, 373 So.2d at 902. This Court has consistently required that, in order to challenge the voluntariness of a plea on appeal, the defendant first move to withdraw the plea at the trial *913 court. See State v. Thompson, 735 So.2d 482, 484 (Fla.1999) (citing Robinson, 373 So.2d at 902-03). Thus, a defendant's failure to timely move to withdraw a plea on voluntariness grounds forecloses review on direct appeal, and the defendant's sole avenue of review is through a collateral attack.
Consistent with our established practice in dealing with a plea-related voluntariness claim presented on appeal for the first time, we now hold the failure of a capital defendant to first attack the voluntariness of a waiver of a sentencing jury at the trial court precludes review on direct appeal. Hence, because of Griffin's failure to first challenge the waiver at the trial court, we cannot address his claim at this stage as he is restricted to collaterally attack the waiver through a postconviction motion.[9]

2. Consideration of Mitigating Circumstances

In issue two, Griffin argues the trial court's failure to consider the mitigating circumstance of Griffin's potential for rehabilitation and future productivity within the prison system constitutes error.
Under our death penalty system, trial courts are required to consider all mitigating evidence presented by the defendant and supported by the record. See Walker v. State, 707 So.2d 300, 318 (Fla.1997). Though the determination of mitigating and aggravating circumstances and the respective weight assigned to each is within the trial court's discretion, we have provided guidelines to govern this discretion:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. The court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence.... The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance.... To be sustained, the trial court's final decision in the weighing process must be supported by "sufficient competent evidence in the record."
Campbell v. State, 571 So.2d 415, 419-20 (Fla.1990) (citations and footnotes omitted). Applying Campbell and its progeny, we find the trial court did not err in its consideration of the mitigating circumstances.
We dispose first of Griffin's argument and reliance upon Cooper v. Dugger, 526 So.2d 900 (Fla.1988), to support his assertion that the trial court failed to consider the evidence of his potential for rehabilitation. While Cooper does in fact stand for the rule that a defendant's potential for *914 rehabilitation is a significant factor in mitigation, 526 So.2d at 902, it is distinguishable from the current case. In Cooper, the trial court conducted a sentencing hearing with the mistaken belief that the defendant could only present evidence of statutory mitigating evidence. See id. Consequently, the defendant was not allowed to present evidence of his rehabilitation potential, a nonstatutory mitigating factor. See id. Nor was the jury allowed to consider the rehabilitation factor in its deliberation. See id. On appeal, the Court vacated the sentence and remanded for a new sentencing hearing to allow the defendant to present his potential for rehabilitation as a nonstatutory mitigating factor. See id. at 903. Here, there was no such controversy and Griffin was allowed to present both categories of mitigating evidence, including his potential for rehabilitation.
As to the sentencing order, the trial court adequately articulated its analysis of the relevant factors inasmuch as it substantially outlined the mitigating factors proposed by Griffin. Yet, the word "rehabilitation" is nowhere in the order. Indeed, the word "rehabilitation" appears only once in Griffin's sentencing memorandum. Instead, the memorandum concentrates on the factual matters relied upon to demonstrate his rehabilitation potential. Admittedly, the absence of the word rehabilitation from the order would, at first glance, indicate that the trial court did not consider Griffin's potential for rehabilitation as submitted at the penalty phase, a potential violation of Campbell. See, e.g., Ferrell v. State, 653 So.2d 367, 371 (Fla. 1995). However, a full reading of the trial court's order reveals otherwise. The order specifically addresses Griffin's employment background, his family background, and his conduct in jail and in the courtroom, all of which were advanced by Griffin as support for his rehabilitation potential. Hence, the trial court's failure to specifically mention rehabilitation in its order was effectively cured by its thorough weighing and consideration of the factors upon which Griffin's potential for rehabilitation was specifically grounded. See Armstrong v. State, 642 So.2d 730, 739 (Fla.1994) ("Although the trial judge's articulation of how he considered the mitigating circumstances and aggravating circumstances is somewhat less than a model of clarity, we believe that he properly considered all nonstatutory mitigating circumstances in imposing the death sentence."). Therefore, we conclude that the trial court's omission of the word "rehabilitation" was at worst harmless error.[10]

3. Doubling of Aggravating Circumstances

In issue three, Griffin argues that the trial court improperly allowed the doubling of two aggravators. Griffin asserts that two of the aggravators, capital felonies committed for pecuniary gain and committed while in the commission of a kidnapping, were based on the same aspect of the offense. We disagree.
The consideration of two aggravating circumstances ("doubling") is improper *915 when they refer to the same aspect of the crime. See Banks v. State, 700 So.2d 363, 367 (Fla.1997). For instance, the aggravating factors of murder committed to avoid lawful arrest and murder committed to disrupt or hinder law enforcement can present the improper doubling problem because when the murder is committed to avoid an arrest, such an act more often than not also hinders law enforcement efforts to apprehend and prosecute the perpetrators. See Bello v. State, 547 So.2d 914 (1989) (improper doubling found where the defendant was shooting at officers to prevent them from taking him into custody and the shooting also prevented the officers from coming to the assistance of a wounded detective).
Unlike the "committed to avoid lawful arrest" and the "committed to hinder or disrupt law enforcement" aggravators, which generally involve improper doubling because they refer to the same aspect of the crime, a murder committed during the course of a kidnapping and a murder committed for pecuniary gain do not necessarily involve the same aspect of the crime, although a kidnapping may be used to facilitate or make easier the commission of a robbery or other crime. The term "pecuniary gain" in the context of the motive for the commission of a crime is generally understood to mean monetary gain. "Pecuniary gain" in the context of criminal law is defined in Black's Law Dictionary 686 (7th ed.) in the following terms:
Any monetary or economic gain that serves as an impetus for the commission of an offense. In most states, an offense and its punishment are aggravated if the offense was committed for pecuniary gain. Murder, for example, is often aggravated to capital murder if the murderer is paid to commit the crime.
Thus, pecuniary gain can be demonstrated if one of the motives for commission of the crime is to get the victim's money or other items of value or to actually receive compensation for having committed the crime. The aspect of the crime for which pecuniary gain is applicable is the motive.
On the other hand, section 787.01(1)(a), Florida Statutes (2001), defines kidnapping as follows:
(1)(a) The term "kidnapping" means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:
1. Hold for ransom or reward or as a shield or hostage.
2. Commit or facilitate commission of any felony.
3. Inflict bodily harm upon or to terrorize the victim or another person.
4. Interfere with the performance of any governmental or political function.
Thus, it appears that in only a portion of paragraph 1 above does kidnapping include the element of pecuniary gain (to hold for ransom or reward). The kidnapping in this case was not committed in order to hold the victims for ransom or reward.
Merriam-Webster's Collegiate Dictionary 68 (10th ed.) defines "aspect" as "a particular status or phase in which something appears or may be regarded." Two aggravating factors are improperly doubled, therefore, only if they refer to the same status or phase of the capital crime. Such is not the case with pecuniary gain and kidnapping. In this case, the pecuniary gain aspect of the murder was the reason or motive for the robbery and murder. The kidnapping was merely a means to facilitate or make easier the robbery. (After the victims were locked in a freezer, the robbers were free to break into the lockers and remove the money bags.) It is *916 evident that the robbery could have taken place without kidnapping the victims.
Additionally, the trial court's outline of the factors for each of these aggravators supports the conclusion that they are not the same aspect of the crime. In discussing pecuniary gain, the trial court said:
The evidence presented by the State at the penalty phase hearing as well as the Defendant's own testimony clearly demonstrate that the crime was committed for pecuniary gain. Testimony also showed that the Defendant was out of work and needed money, that he planned the robbery for over two weeks, and that he told a witness prior to the crime that he was going to "knock somebody over." After the robbery, the Defendant had plenty of money, enough to rent an expensive hotel room and drink expensive champagne, whereas before the crimes he was broke and could not support his children.
On the other hand, the trial court's discussion of the kidnapping aggravating factor[11] proceeded thusly:
The facts of this case show that one or both of the victims knew this Defendant and after he and Lopez were given admittance to the Service America warehouse, they locked both victims in one of the freezers while they stole money bags from the storage lockers. Both victims were forcibly taken at gunpoint from the dock area where the perpetrators were let in to the freezer area, some fifty feet away. Testimony at the penalty phase showed that both victims remained in a freezer until all the money was taken from the lockers and placed in the getaway van and then the Defendants went back to the freezer and killed the victims. The Defendant testified that they brought the guns with them to place the victims in fear so they would not resist. The movement of the victims was not slight and was not necessary for the commission of the robbery.
Because the kidnapping in this case and the fact that the murder was committed for pecuniary gain do not involve the same status or phase of this criminal episode, the trial court properly found these aggravating factors are not the same aspect of the crime. These two factors do not constitute improper doubling.

4. Proportionality

Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). In conducting this review, this Court makes a comprehensive analysis in which it determines whether the crime falls within the category of both the most aggravated and the least mitigated of murders, see Cooper v. State, 739 So.2d 82, 85 (Fla.1999), thereby providing for uniformity in the application of the sentence. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998).
We find the sentences proportionate in the instant case. As noted earlier, the trial court found four aggravating factors: (1) conviction of a prior capital felony; (2) commission of the murders during the commission of a kidnapping; (3) commission to avoid arrest; and (4) commission for pecuniary gain. As it relates to statutory mitigators, the court found that Griffin had no significant prior history, but assigned little weight to this factor. The trial court also found that Griffin partly *917 established the mitigator that he was an accomplice in the capital felony committed by another person and his participation was relatively minor. The court, however, assigned little weight to this factor because Griffin planned the events leading to the murders, procured the weapons, and carried out the plans. The court gave great weight to Griffin's family and employment backgrounds and assigned little to no weight to the remainder of the proposed statutory mitigators. As to nonstatutory mitigators, the court gave moderate weight to his jail conduct and courtroom demeanor and moderate weight to his remorse for the two deaths. In all, the mitigation was minor. It is important to note that both mental health experts testified that the accidental pellet gun injury suffered by Griffin as a child resulted in no permanent damage. So, Griffin's mental state at the time he committed the murders is not in question, and thus there was no mitigation in the form of mental irregularities to weigh against the substantial aggravating circumstances.
We have affirmed death sentences in cases with less aggravation than the current case and comparably insubstantial mitigation. See, e.g., Sliney v. State, 699 So.2d 662 (Fla.1997) (finding the death penalty proportional with the existence of two aggravating circumstances of commission during a robbery and avoid arrest, two statutory mitigators (age and lack of criminal history), and a number of nonstatutory mitigators); Ferrell v. State, 680 So.2d 390 (Fla.1996) (affirming death sentence where sole aggravator was prior second-degree murder and little weight assigned to mitigating factors); Duncan v. State, 619 So.2d 279 (Fla.1993) (affirming death sentence where sole aggravator was prior second-degree murder and mitigation was minor); Hayes v. State, 581 So.2d 121 (Fla.1991) (affirming the death penalty where evidence established two aggravating circumstances of CCP and commission during a robbery, one statutory mitigator (age), and other nonstatutory mitigators). In this case we have four strong aggravators and very little mitigation. Comparing these circumstances with those of the foregoing and other capital cases, we conclude that death is proportionate.
Accordingly, for the reasons stated in this opinion, we affirm Griffin's convictions for first-degree murder and sentences of death.
It is so ordered.
WELLS, C.J., and HARDING and QUINCE, JJ., concur.
SHAW and LEWIS, JJ., concur as to the convictions and concur in result only as to the sentences.
ANSTEAD, J., concurs specially with an opinion, in which PARIENTE, J., concurs.
ANSTEAD, J., specially concurring.
Although I concur in the majority's decision to affirm, I cannot agree that the aggravators involving pecuniary gain and kidnapping were not based upon the same underlying circumstance, i.e., robbery.
As explained in the majority opinion, this Court has held that no more than one aggravating factor may be considered based upon the same set of underlying circumstances. The independent consideration of the aggravating factor of murder committed for pecuniary gain and certain other related aggravating factors is particularly restricted. See, e.g., Maggard v. State, 399 So.2d 973, 977 (Fla.1981); Provence v. State, 337 So.2d 783, 786 (Fla. 1976). This is because the pecuniary gain factor is frequently associated with the general purpose of many enumerated felonies. Consequently, we have held that murder committed during the commission *918 of a robbery and for pecuniary gain, for instance, may not be considered as two separate aggravating factors when the evidence of the robbery also serves as the basis of the finding of the pecuniary gain factor. See Provence, 337 So.2d at 786.
Similarly, we have held that in order to consider pecuniary gain and murder during a burglary as separate and distinct aggravating circumstances, the burglary must be shown to have had a much greater and independent significance than just being the means of accomplishing the pecuniary gain. See Brown v. State, 473 So.2d 1260, 1267 (Fla.1985). In Cherry v. State, 544 So.2d 184, 187 (Fla.1989), this Court found that separate reliance upon the pecuniary gain and commission of the murder during a burglary constituted erroneous doubling. In Cherry, the defendant's roommate testified that right before he went out to commit the murders, the defendant told her that "he needed some money." Id. at 185. Immediately afterwards, he burglarized a small two-bedroom house, and robbed and killed the occupants, an elderly couple. See id. The Court concluded that "there is no question in this case that the sole purpose of Cherry's burglary was pecuniary gain." Id. Hence, the Court held that because the sole purpose of the burglary was to achieve the pecuniary gain, the two aggravators must be considered as a single aggravator. See id. at 187.
Though the enumerated felony in Cherry was a burglary, the current case is similar to Cherry in that the sole purpose of the kidnapping here was for pecuniary gain. Griffin locked the victims in the freezer as a means of not having to deal with them as he tried to open up the metal money lockers. While it is possible that Griffin might not have absolutely needed to lock the victims in the freezer to accomplish the theft, locking them inside obviously allowed him to take the time and action necessary to accomplish the physical task of prying open the metal lockers. Griffin's act of locking up the victims made that task much easier because he did not have to simultaneously guard the victims and open the lockers. Hence, the overriding purpose of this kidnapping was to accomplish the task of prying open the lockers without any distraction or interference from the victims.
The same rule we applied to burglary in Cherry must be applied to the aggravating factors of the kidnapping involved herein; that is, the kidnapping must be shown to have had a much broader purpose than just the facilitation of the pecuniary gain if it is to be counted as a separate aggravator. See Green v. State, 641 So.2d 391, 395 (Fla.1994). There has been no such showing. Indeed, the proof is to the contrary. Under this analysis, I conclude that the aggravating factors of pecuniary gain and kidnapping were improperly doubled here.
Accordingly, I conclude that much as in Cherry, both the kidnapping and the pecuniary gain factors here were "based on the same aspect of the criminal episode and should therefore have been considered as a single aggravating circumstance." 544 So.2d at 187 (quoting Mills v. State, 476 So.2d 172, 178 (Fla.1985)). Nonetheless, I would find any error on this issue to be harmless in view of the remaining substantial aggravation found by the trial court and discussed in the majority opinion.
PARIENTE, J., concurs.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] Griffin testified to have worn a ski mask while Lopez wore a hooded jacket which helped him cover his face. However, Hall testified that Griffin told her that he did not wear a mask because he needed to be recognized by McCallops in order to be let into Service America.
[3] See § 921.141(5)(b), Fla. Stat. (1997). Note that the finding of prior capital offense with respect to each murder here is based on the conviction of the other count of first-degree murder.
[4] See § 921.141(5)(d), Fla. Stat. (1997).
[5] See § 921.141(5)(e), Fla. Stat. (1997).
[6] See § 921.141(5)(f), Fla. Stat. (1997).
[7] The aggravating and mitigating circumstances and the weight assigned to each are discussed in greater detail in the proportionality section, issue 4, infra.
[8] Because Griffin pled guilty, there are no guilt phase issues. However, he raises the following penalty phase issues: (1) the trial court erred in finding that Griffin had voluntarily and intelligently waived his right to a jury during the penalty phase; (2) the trial court erred in failing to consider a mitigating circumstance presented by the defense; and (3) the trial court erred in considering two aggravating circumstances which refer to the same aspect of the offense. Though Griffin does not challenge the proportionality of his sentence, we address it in issue (4).
[9] Nevertheless, we refer this issue to the Florida Bar Criminal Procedure Rules Committee to devise a rule to guide a trial court during a colloquy preceding an acceptance of a defendant's waiver of his rights to a sentencing jury. In the context of a plea, Florida Rule of Criminal Procedure 3.172(c) provides the trial court with a checklist of factors that must be covered in a colloquy to ensure the voluntariness of a plea entered into by the defendant. We believe a similar rule delineating the various rights of a capital defendant in a capital phase would ensure that the trial court conduct a colloquy which apprises the defendant of all the rights relinquished through a waiver (i.e., presentation of mitigation, advisory nature of jury, etc.). Of course, an attendant requirement of a showing of prejudice would also apply just as provided for by rule 3.172(i) in the context of a plea.
[10] Though we find the trial court's sentencing order adequate in this instance, we nevertheless reiterate the importance of Campbell and its requirement of a thorough written evaluation of the proposed mitigating circumstances. Certainly, we will not remand where the trial court's order is only minimally defective. But where the order is made up of conclusory statements or otherwise reflects a perfunctory evaluation on the part of the trial court, harmless error analysis will not save that order. See Jackson v. State, 704 So.2d 500, 506 (Fla.1997). That was simply not the case here, where the trial court issued a comprehensive and detailed order thoroughly treating all of the matters claimed by the parties in aggravation or mitigation.
[11] It is clear from the trial court's order that it considered the issue of improper doubling during the discussion of the kidnapping aggravator. The trial court did not find the aggravating factor of murder committed during the course of a robbery because it considered the robbery aggravator would be an improper doubling of pecuniary gain.