# Supreme Court of Florida

_____

No. SC2023-1000
_____

**DONALD OTIS WILLIAMS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 17, 2025

PER CURIAM.

The appellant, Donald Otis Williams, was previously sentenced to death for the 2010 first-degree felony murder of 81-year-old Janet Patrick. Following a new penalty phase proceeding conducted pursuant to _Hurst v. State_,[1] Williams was again sentenced to death for Patrick's murder. This is the direct appeal of Williams's newly imposed death sentence. We have jurisdiction.

_____

1. _Hurst v. State_, 202 So. 3d 40 (Fla. 2016) (interpreting _Hurst v. Florida_, 577 U.S. 92 (2016), as requiring that a jury unanimously recommend the death penalty), _receded from in part by State v. Poole_, 297 So. 3d 487 (Fla. 2020).

*See* art. V, § 3(b)(1), Fla. Const.  As we explain, we affirm Williams's sentence of death.

## BACKGROUND

In Williams's original direct appeal, this Court detailed the facts surrounding the disappearance and murder of Patrick, who was last seen alive during a shopping trip at a grocery store near her home in Lake County.  *See Williams v. State*, 209 So. 3d 543, 548 (Fla. 2017).  Eyewitness testimony and store surveillance video footage confirmed that on October 18, 2010, Williams was seen with Patrick inside of the grocery store and later seen getting into the passenger seat of Patrick's car.  *Id.*  Days later, law enforcement took Williams into custody after finding him sitting in Patrick's car in Polk County.  *Id.*  Patrick's credit cards were in Williams's pocket. *Id.*

Williams gave interviews to the media while in custody, during which he made unsubstantiated claims that he and Patrick were abducted by an unknown person.  *Id.*  The day after the interviews, investigators found Patrick's severely decomposed body under two tires in a wooded area in Polk County.  *Id.*  The wooded area was

located a mile and a half from a residence where Williams lived years earlier.  *Id.*

Although the condition of Patrick's "partially skeletonized" body prevented the medical examiner from determining the cause of death, the medical examiner ruled out accidental death and concluded that the manner of death was homicide.  *Id.* at 548, 549.

Evidence revealed that in the days following Patrick's disappearance, Williams borrowed a shovel from one of his acquaintances and never returned it.  *Id.* at 548.  Investigators found the shovel in a cemetery in Polk County, and discovered near the shovel was some plastic irrigation tubing that "appeared to have been stretched and had characteristics consistent with" a piece of such tubing found in the trunk of Patrick's car.  *Id.* at 549.

Various items retrieved from Patrick's car contained DNA that matched Williams's DNA profile.  *Id.*  Additionally, blood evidence retrieved from the car contained DNA that matched Patrick's DNA profile.  *Id.* at 549-50.

Williams was charged with and tried for the first-degree murder of Patrick, as well as one count of robbery and one count of

kidnapping.  *Id.*  Williams's defense was that he was suffering from a mental illness or seizures at the time of the crimes.  *Id.* at 551.

The jury found Williams guilty as charged, and the case proceeded to the penalty phase.  *Id.*  The jury recommended by a vote of nine to three that Williams be sentenced to death, and the trial court subsequently sentenced Williams to death.  *Id.* at 552, 554.

**Original Direct Appeal**

In 2017, this Court affirmed Williams's convictions, as well as his sentences for robbery and kidnapping.  *Id.* at 567.  However, because the jury's recommendation of death was not unanimous, this Court reversed Williams's death sentence and remanded for a penalty phase pursuant to *Hurst v. State*.  *Id.*

**Post-*Hurst* Developments**

While Williams's new penalty phase was pending, this Court decided *Poole* and receded from the *Hurst v. State* requirement that a jury's recommendation of death be unanimous.  *See Poole*, 297 So. 3d at 507.  In response to *Poole*, the State filed a motion in the trial court to reinstate Williams's death sentence, and Williams filed in this Court a petition for writ of prohibition to prohibit the trial

court from doing so. Before this Court decided the petition, the trial court granted the State's motion and reinstated Williams's death sentence.

We ultimately granted Williams's petition in light of our decision in *State v. Okafor*, 306 So. 3d 930, 932 (Fla. 2020) (holding that the "judgment vacating [the defendant's] death sentence [pursuant to *Hurst v. State*] is final, that neither we nor the trial court can lawfully reinstate that sentence, and that resentencing is therefore required"). As a result, Williams's new penalty phase was allowed to proceed.

**Williams's New Penalty Phase**

The State filed its notice of intent to seek the death penalty and identified five aggravating factors: (1) the capital felony was committed by a person previously convicted of a felony and on felony probation; (2) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (prior violent felony); (3) the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit kidnapping; (4) the capital

felony was committed for pecuniary gain; and (5) the victim of the capital felony was particularly vulnerable due to advanced age or disability.

At a March 2017 status hearing, Williams stated that he wished to represent himself during the new penalty phase proceedings. The trial court granted Williams's request to proceed pro se after conducting a *Faretta*[2] hearing, during which the court advised Williams of the risks of self-representation. During the several years from 2017 to Williams's 2023 penalty phase trial and sentencing, the court appointed a series of standby counsel. Attorney Jason Wise, appointed as standby counsel in 2020, served as standby counsel through Williams's sentencing in 2023. During this time, Williams was also appointed a series of mitigation specialists.

Months before the trial, the court set a trial date of April 3, 2023. On February 17, 2023, Williams filed a written motion to continue the trial for the purpose of obtaining new "evaluators"; i.e., mental health experts. In his written motion and at a pretrial

---

2. *Faretta v. California*, 422 U.S. 806 (1975).

motion hearing on February 28, 2023, Williams cited his inability to secure a mitigation specialist who would arrange for experts to evaluate him. The trial court denied the continuance and noted that any expert witnesses for trial would have to be disclosed by March 8, 2023.

The penalty phase began as scheduled on April 3, 2023. Williams waived a jury trial and the presentation of mitigation. The trial court asked attorney Wise to continue as standby counsel. In light of Williams's waiver of the presentation of mitigation, the court also held a preliminary discussion with Williams, standby counsel, and the State about the possibility of appointing special counsel to present mitigation.

The bench trial included the live testimony of some of the State's original trial witnesses, and the read-back or play-back of the original trial testimony of other witnesses. After the State rested, Williams later rested without presenting any witnesses. The trial court then rendered its decision not to appoint special counsel to present mitigation, indicating that it took notice of the "tremendous" amount of mitigation presented during the original

trial. The court ordered a presentence investigation (PSI). Williams later waived a *Spencer*[3] hearing.

On July 7, 2023, the trial court sentenced Williams to death based on its finding of four aggravating factors: (1) Williams was previously convicted of a felony and on felony probation (great weight); (2) prior violent felony (great weight); (3) the capital felony was committed while Williams was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit kidnapping (great weight); and (4) the victim was particularly vulnerable due to advanced age or disability (great weight). Finding that Williams's possession of Patrick's vehicle and credit cards was collateral to the kidnapping and not a motive for the crimes, the court rejected the pecuniary gain aggravating factor.

The trial court also found the existence of two statutory mitigating circumstances: (1) the capital felony was committed while Williams was under the influence of extreme mental or emotional disturbance (considerable weight); and (2) Williams's

---

3. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (significant weight).

The trial court further found the existence of fifteen nonstatutory mitigating circumstances: (1) Williams manifested appropriate courtroom behavior (some weight); (2) Williams served in the United States Marine Corps (slight weight); (3) Williams was a good probationer (slight weight); (4) Williams suffered physical, mental, and emotional abuse as a child (moderate weight); (5) Williams was struck by a car resulting in a shattered leg (some weight); (6) Williams has a family and personal history of alcohol abuse (some weight); (7) Williams has a family and personal history of mental illness (considerable weight); (8) Williams witnessed his mother being abused by his father (some weight); (9) Williams suffered head injuries while he was growing up (some weight); (10) Williams was a good father (slight weight); (11) Williams was a loving companion (slight weight); (12) Williams was a hard worker (slight weight); (13) Williams helped others when he could (slight weight); (14) Williams has witnessed two deaths (some weight); and (15) Williams is in poor health (slight weight).

This appeal follows.

## ANALYSIS

Williams was appointed the services of the appellate public defender. He raises four issues for this Court's consideration, which we address in turn. None of the issues merits relief.

### I. Denial of Motion to Continue

Williams argues that the trial court abused its discretion by refusing to grant him a continuance to secure a new mitigation specialist. Even if we assume that this issue as framed on appeal is properly preserved, Williams is not entitled to relief.

Whether to grant a continuance is a matter that lies within the trial court's discretion. *Bouie v. State*, 559 So. 2d 1113, 1114 (Fla. 1990). "[T]he court's ruling will be disturbed only when that discretion has been abused." *Id.* (citing *Woods v. State*, 490 So. 2d 24, 26 (Fla. 1986)). Abuse of discretion is a "highly deferential" standard of review, and "we will not find an abuse of discretion unless the trial court makes a ruling which no reasonable judge would agree with." *Wells v. State*, 364 So. 3d 1005, 1013 (Fla. 2023) (citing *Kelley v. State*, 974 So. 2d 1047, 1051 (Fla. 2007)). Williams has not met this showing.

As an initial matter, Williams's argument that he is constitutionally entitled to a mitigation specialist is without merit. Although Williams cites several sources—a state statute relating to the payment of mitigation specialists, American Bar Association guidelines, a law review article, and various appellate court decisions—none of them stand for this proposition.

We are mindful that since being granted a new penalty phase in 2017—for reasons ranging from Williams's multiple requests for the appointment of a new specialist to the serious illness of one of his appointed mitigation specialists—Williams was appointed a series of mitigation specialists. The record reflects the extent of the efforts to provide him with mitigation specialists and investigators during this time.

Just weeks before the start of Williams's new penalty phase trial and with Williams fully aware of the April 3, 2023, start date, Williams requested a sixty-day continuance to secure new evaluators because he was unable to secure a new mitigation specialist to assist in obtaining evaluators for him. At a hearing in December 2022, the trial court discussed with Williams the

difficulties of getting and keeping a mitigation specialist while proceeding pro se.  Standby counsel noted the following:

> STANDBY COUNSEL: Your Honor, the difficulty I've had when I've checked in with the mitigation specialists, as Mr. Williams said, the specialist will not work with a pro se Defendant.  I commissioned one, I think that Mr. Williams had discussions with previously.  One that might be able to do it is [C.S.], but I'm not sure where the discussions went that Mr. Williams had with her.  I'd be happy to check with other mitigation specialists that he may have, but all the others that I have worked with in the past are not willing to do a pro se Defendant.

The trial court advised Williams that it would appoint another mitigation specialist if one agreed to work on the case but also warned Williams of the approaching March 2023 deadline for disclosing any mental health experts for the upcoming trial.  When asked whether he wanted to continue representing himself given these parameters, Williams said that he did:

> THE COURT: And those [prior] proceedings are a nullity. Basically we're starting over.  So my question is, as we sit here today, do you wish to have an attorney appointed to represent you or are you going to continue to represent yourself?
>
> DEFENDANT: I'm going to continue to represent myself.
>
> THE COURT: Very well.  All right.  Then I'll just wait for the email from Mr. Wise.  I have no problem with substituting your mitigation specialist, just make sure we

have somebody that will take the job.  So we will see
what we can do.

Williams explains in his initial brief in this appeal: "The Appellant and standby counsel could not secure a replacement mitigation specialist by the February 2023 status conference because the Appellant was representing himself."  Under these circumstances, the court did not err in denying a continuance.

Moreover, the cases on which Williams relies to argue that the trial court erroneously denied his motion to continue—*Brown* and *Hill*[4]—provide no support for his claim.  In both cases, the district court concluded that the denial of a continuance was an abuse of the trial court's discretion.  However, these cases are distinguishable from Williams's case in one key respect: they both involve a motion to continue that was sought for the purpose of seeking an attorney, not for the purpose of seeking a mitigation specialist.  *See Brown*, 38 So. 3d at 214 (holding that the trial court abused its discretion, observing that "Mr. Brown requested the continuance to seek private counsel. . . .  Denying a defendant the

_____

4.  *Brown v. State*, 38 So. 3d 212 (Fla. 2d DCA 2010); *Hill v. State*, 157 So. 3d 481 (Fla. 2d DCA 2015).

- 13 -

right to counsel of his choice, without good cause, is prejudicial per se."); *Hill*, 157 So. 3d at 483 (holding that the trial court abused its discretion where the record did not support the denial of a continuance to seek private counsel, there had been no prior continuance, and the State did not object to the request).

Because the trial court did not abuse its discretion in denying Williams a continuance, he is not entitled to relief.

## II. Voluntariness of Williams's Waivers

Williams also contends that the trial court erred by accepting his waiver of a penalty phase jury and his waiver of the presentation of mitigation. Under this Court's precedent, Williams is foreclosed from challenging the jury waiver on direct appeal, because he did not seek to revoke the waiver in the trial court. *See Griffin v. State*, 820 So. 2d 906, 913 (Fla. 2002). In any event, both claims are without merit.

About ten days before the penalty phase began, Williams participated in a discussion at a March 24, 2023, motion and status hearing about the implications of waiving a jury:

> PROSECUTOR: Mr. Williams, let me just ask you a couple of other things; if I could.

- 14 -

Just—again, just make sure, this is your decision, and your decision alone, to waive a jury, right?

DEFENDANT: That's correct.

PROSECUTOR: And this is what you want to do, to waive a jury?

DEFENDANT: It's not entirely my want. It is—although, it's voluntarily, but it's not entirely a clear case of I want to do this. It's a little bit more complicated than that, but I voluntarily waive the participation of jury in this resentencing phase.

PROSECUTOR: Mr. Williams, you understand that if you have a jury trial, that a single juror can vote for a sentence of life without parole and prevent a death sentence from being imposed. You do know that, right?

DEFENDANT: Well, yes, I do. I'm very aware that eleven-one recommendation or eleven-one vote would put me in life in prison rather than in death, but you have to understand that I have been on death row. Even though I have not been legally sentenced to death, I have been on death row and treated as a death row prisoner. I have been denied physical access into the law library, ever since I've been on death row, and that was March the 3rd of 2014. No matter how many times that we went to court where the State has wrongly put a motion in to impose the death sentence back on March the 5th, 2020 by *Poole*—State versus *Poole*, I have been treated as a death row prisoner. The reason that—one of the reasons is that I'm choosing to waive the right to jury, is because I have not had time to prepare for a jury trial. So, there would be no sense in me asking the Court to go with a jury trial when I have no way of presenting my case for mitigation to a jury.
So, the Court knows, as well as anyone, of all the facts of this case. It's not simply going over to a jury and

saying where's your mitigation specialist, where are your experts, where is that when I had no reason—I had no way to actually bring them into court.

PROSECUTOR: So, Mr. Williams, it sounds to me as if you are telling us that because you have not had the opportunity to get your mitigation in order, that you feel it necessary to waive the jury and proceed to a bench trial. Is that what you're saying?

DEFENDANT: Again, it's not as simple as you may—as that sounds. But again, I wanted to go back—this is part of the court record, it's part of the Supreme Court record back in August the 1st of 2019. I was threatened and my family was threatened and by a verbal warning and a verbal assurance by a member of this court and the member of the State of Florida that if I called them, if I subpoenaed them, that my witnesses and myself would be killed. That is a fact, that is an irrefutable fact, that is something that I would take a polygraph on, but that is another reason, among the many others, basically of what you said that the reason I could not get the mitigation specialist to—to even once we got court appointed, many, many of them and they just quit on their own without notifying me or notifying the Court that they were quitting and it cost me thousands of dollars of my own money to find out where they were and what they did. I had no way to present this Court with mitigation elements to properly prepare for a jury trial.

So therefore, one of the other reasons was that, that what I had stated on the motion for continuance that I provided this Court with, is I was not prepared to present anything to the jury, when I was denied the right to [a] mitigation specialist.

PROSECUTOR: So, are you telling the Court, Mr. Williams, that because you were not given a continuance, you have decided to waive a jury?

DEFENDANT: Again, Mr. Nunnelley, that's one of several reasons.

PROSECUTOR: I'm not satisfied with this, Judge.

THE DEFENDANT: Your Honor, may I ask a question, please?

PROSECUTOR: Judge, if we could confer just for a moment, please?

THE COURT: Just one moment, Mr. Williams, and I'll give you an opportunity to speak.

(There was a pause.)

PROSECUTOR: Thank you, Judge.

THE COURT: I just want to say, from my perspective, the question here is whether Mr. Williams has a jury make a recommendation to the Court or whether the Court hears the evidence directly and makes it's [sic] own findings without the benefit of a jury recommendation. Whether the continuance was granted or not, that issue will be there with a jury or without a jury. So, it seems to me kind of not really relevant to the question of, are you waiving your right to a jury for these proceedings versus a bench trial, which you had requested on Monday? I'm not changing my position on the motion to continue. It was objected to by the State and I believe I have good grounds for denying that motion to continue, as this case has been pending for a very long time and Mr. Williams has always had the right to have counsel.

He has said the mitigation folks that are on the [Justice Administrative Commission's] list won't work with pro se defendants. I will take that as a true statement because I have no contrary evidence to that. But obviously, the answer to that is have counsel and don't be pro se. Same for I can't get to the law library

- 17 -

because I'm on death row. Again, I have no contrary evidence to that, I'll assume that is true. The answer to that would be have a professional represent you during the trial.

So, having said that, Mr. Williams, you wanted to make some statements about the jury trial versus bench trial? I mean, obviously, whether I erred in granting or denying a motion to continue is going to be pending however we go forward with these proceedings for an appellate purpose.

After further discussion, the Court continued:

THE COURT: Well, it's a simple question. Do you wish to be represented by an attorney, or not?

THE DEFENDANT: No.

THE COURT: State, anything else that you wish to inquire, as far as the jury goes? I'm gonna proceed ahead as if we may be having a jury trial and continue with qualifications and—general qualifications and hardships next week. There will be a pool available, should Mr. Williams change his mind. If he does not, we'll release them and schedule from there for as soon as we can get your witnesses in.

. . .

PROSECUTOR: . . . Are you reserving ruling, as far as making a determination as to Mr. Williams' willing, freely and voluntary waiver of jury trial until April 3rd on Monday when he is in court?

THE COURT: I think that is the best course of action at this time. You had sort of prefaced that on Monday. Like, his right to an attorney, I can't—I'm not going to deny him a fundamental Constitutional right, so we will be prepared either way.

I will put on the record, I am about knee deep in transcripts from prior trials, so if it is a bench trial, I can—I will at that time be able to certify that I have read everything. And if it's not, then we'll go on with jury selection.

So yes, I am reserving, anticipating it will be a bench trial, but with a back-up that we'll be ready for a jury trial, if need be.

Then, at the beginning of the penalty phase, the trial court again addressed Williams's pro se status and inquired about his intent to waive a jury trial:

THE COURT: Okay. You know Mr. Wise is here as standby counsel and if you change your mind, by all means at any time during the proceedings, please let me know.

I will ask you every morning as we come in whether or not you wish to continue to represent yourself, but if it's sometime in the middle of a proceeding, please let me know if you change your mind.

DEFENDANT: I will, Your Honor.

THE COURT: Okay. So the next question I have is Mr. Williams had indicated he would like this as a bench trial. I went ahead and did qualifications. I anticipated this.

DEFENDANT: I apologize, Your Honor.

THE COURT: That's all right. No, I figured. So, Mr. Williams, do you still wish to have a bench trial or have you changed your mind about that and want to have a jury trial?

DEFENDANT: Your Honor, I hate—I hate to start off these proceedings with would you give me a minute, but would you give me just one minute, just one small minute?

THE COURT: Sure.

DEFENDANT: Your Honor, the defense waives mitigation.

THE COURT: Okay. Can I get an answer to my first question which is are we doing this as a bench trial or a jury trial?

DEFENDANT: We're doing this as a bench trial, Your Honor.

PROSECUTOR: May I approach, Your Honor? We have a signed waiver that was executed by Mr. Williams on March 24th. I signed it this morning.

THE COURT: And that is for the waiver of jury trial?

PROSECUTOR: Waiver of a jury trial.

THE COURT: Okay.

PROSECUTOR: If we could get a copy of that at some point in time over the week that would be good.

THE COURT: Yes, sir. It will be e-filed today. Will that work or do you still want a copy?

PROSECUTOR: Good enough, Judge.

THE COURT: And, Mr. Williams, do you feel you've had adequate time to talk to your standby counsel about the benefits, pros and cons, of a bench trial versus a jury trial?

DEFENDANT: I hate to say to be honest because that means that everything that I said before is a lie, but I— I stress that fact to say, Your Honor, I have not spoken to Attorney Wise concerning any of this trial.

THE COURT: Okay.

DEFENDANT: I have consulted others of my defense team before making this decision.

THE COURT: I think we did go over this briefly, that a recommendation from 12 impartial jurors, all you need is one to forestall the death penalty and get a life sentence.

I will tell you I've spent countless hours reading all of the prior trial transcripts. I think I have one closing argument to finish, but other than that I have read everything, so I feel pretty apprised of what had previously been presented. So it is completely up to you. I don't want to sway you one way or the other, but if it's a bench trial you want, then that's fine.

Subsequently, the trial court addressed whether Williams knowingly and voluntarily waived the presentation of mitigation. The court noted Williams's objection to the denial of the motion to continue as Williams's rationale for waiving mitigation:

THE COURT: All right. Well, I am satisfied both [sic] with *Faretta.* I am not so satisfied with the knowingly and voluntarily waiving of mitigation. So what I'd like to do is proceed with the state's case. I will ask Mr. Williams again if he has changed his mind or is going to be declining to put on any new mitigation for this proceeding.

After further discussion, the court continued:

- 21 -

THE COURT: I think so. I think at this point, I mean, there is an affirmative waiver of wanting to put on any mitigation, but as I'm beginning to understand Mr. Williams' argument, he feels he's unable to present any additional mitigation due to various reasons.

So what I'm going to do is let's proceed with the state's case this afternoon and I will ask Mr. Williams again. If he decides that he does have some information he wants the Court to be aware of and present as mitigation, I'm certainly not going to preclude him from doing that. If he has no witnesses and no additional evidence, then he has none. . . .

After the State presented its case, Williams determined that he would not present any witnesses and rested. Additionally, Williams stated the following:

DEFENDANT: The defense would like to waive every entitled right that we have from now on. If it's a *Spencer* hearing, if it's a PSI, if I could waive the PSI I will. If the Court perceives this is going to take a couple weeks or a month, I would ask that the Court order my transfer back to [prison] as quickly as possible and that's—unless Mr. Wise has something to say about the end of this, other than the state's closing arguments, I have nothing more that I can say.

These exchanges notwithstanding, Williams argues that the totality of the circumstances renders his waivers involuntary and cites three factors: (1) lack of law library access; (2) threats against Williams and members of his family; and (3) his inability to secure a new mitigation specialist as trial approached. Under this Court's

- 22 -

precedent, in a challenge to the waiver of a penalty phase jury, we ask whether the record affirmatively shows that the waiver was knowing, intelligent, and voluntary. *Boatman v. State*, 402 So. 3d 900, 922 (Fla. 2024). And we apply the abuse of discretion standard to review a trial court's acceptance of a death penalty defendant's waiver of the right to present mitigating evidence. *Robertson v. State*, 187 So. 3d 1207, 1212 (Fla. 2016). There being no error under the governing standards of review, we will not disturb the trial court's acceptance of Williams's waivers.

Having been repeatedly offered the assistance of counsel and fully informed as to the challenges that may arise during pro se representation, Williams cannot now use those challenges to undermine his valid waivers. During the *Faretta* inquiry in March 2017, the trial court explained to Williams that "your attorney would have access, a lot more access to legal research." Williams stated that he understood, and throughout the proceedings, he repeatedly rejected the assistance of counsel.

Moreover, having received the appointment of multiple mitigation specialists by late 2022, Williams was aware of the difficulty in securing a mitigation specialist or maintaining the

- 23 -

assistance of one while proceeding pro se. Nonetheless, Williams continued to represent himself, and, while he had the right to do so, he also assumed the attendant risks.

Further, even if the trial court erred in accepting Williams's waiver of the right to present mitigating evidence, any such error would be harmless. Consistent with its obligation to consider mitigation anywhere in the record, the court relied on the fully developed mitigation from Williams's original penalty phase as well as the most recent PSI. *See Robinson v. State*, 684 So. 2d 175, 177 (Fla. 1996) ("It is well settled that mitigating evidence must be considered and weighed when contained anywhere in the record, to the extent it is believable and uncontroverted."). Indeed, the court found not only fifteen nonstatutory mitigating circumstances of varying weights, but two statutory mitigating circumstances— extreme mental or emotional disturbance (considerable weight), and substantial impairment of the capacity to appreciate the criminality of conduct or to conform conduct to the requirements of law (significant weight). In fact, the court found one more statutory mitigating circumstance and two more nonstatutory circumstances

than did the original trial court.  *See Williams*, 209 So. 3d at 553-54.  As such, Williams is not entitled to relief.

### III. Discovery

Next, Williams asserts that he was deprived of access to discovery materials provided by the State.  He further maintains that he was not informed of the risks of self-representation and that he did not knowingly and intelligently forgo the benefits of having the assistance of counsel.  Williams's arguments are without merit.

First, the record reflects that the State satisfied its discovery obligation by providing the defense with discovery.  Second, the trial court provided Williams with an opportunity to review evidence during the penalty phase trial.  Third, to the extent that Williams argues "the trial court failed to warn [him] of the pitfalls of self-representation," the record soundly refutes this claim.

We also decline Williams's invitation to recede from *Wilcox*,[5] and we reject Williams's suggested interpretation of that opinion.

---

5. *Wilcox v. State*, 143 So. 3d 359, 376 (Fla. 2014) (concluding that the State was not required to provide a pro se defendant a transcript of a witness interview where the State only had a DVD recording of the interview, and stating that "[t]he [criminal discovery] rules do not require the State to produce and disclose

## IV. Constitutionality of Florida's Death Penalty

Williams challenges the constitutionality of Florida's capital sentencing scheme, arguing that (1) it does not sufficiently narrow the class of individuals eligible for the death penalty, and (2) the elimination of comparative proportionality review removed a necessary safeguard against arbitrary and inconsistent sentencing. We have considered and repeatedly rejected Williams's arguments. *See Miller v. State*, 379 So. 3d 1109, 1127 (Fla. 2024) (rejecting challenges to Florida's capital sentencing scheme based on "aggravator creep" and the elimination of comparative proportionality review).

## CONCLUSION

For these reasons, we affirm Williams's sentence of death for the murder of Janet Patrick.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

---

information which is not within the State's actual or constructive possession").

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

I continue to adhere to the views expressed in my dissenting opinion in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020) (abandoning this Court's decades-long practice of conducting comparative proportionality review in cases involving the direct appeal of a sentence of death).

For this reason, I concur in result as to the affirmance of Williams's death sentence.

An Appeal from the Circuit Court in and for Lake County,
    Heidi Davis, Judge
    Case No. 352011CF000105AXXXXX

Matthew J. Metz, Public Defender, and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit of Florida, Daytona Beach, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Naomi Nichols, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee